**RAY BAILLIE TRASH HAULING, INC.,
et al., Plaintiffs,**

v.

**Thomas S. KLEPPE, Administrator Small
Business Administration, et al.,
Defendants.**

**Civ. No. 71–1030.**

United States District Court,
S. D. Florida,
Miami Division.

Oct. 29, 1971.

Bernard L. Jaffee, Miami, Fla., Alexander Boskoff, Washington, D. C., for plaintiffs.

Robert W. Rust, U. S. Atty., Miami, Fla., for defendants.

## JUDGMENT

KING, District Judge.

Upon consideration of plaintiffs' verified complaint, the admission in open court on 29 June 1971 by the United States Attorney for the Southern District of Florida and counsel for the Small Business Administration that there is no issue of material fact respecting the allegations set forth in said verified complaint and that there are present only legal issues to be determined by the Court without further hearing, and upon consideration of the motion for summary judgment filed in behalf of plaintiffs, the motion to dismiss or, in the alternative, for summary judgment filed by the Assistant Attorney General of the United States in behalf of the defendants, the affidavits, exhibits and briefs filed by the respective parties, the Court hereby adjudges and decrees as follows:

### Findings of Fact

1. Plaintiffs are independent firms engaged in the business of collecting and hauling refuse to disposal sites, and each is a "small business concern" as defined by applicable statute (15 U.S.C.A. § 631 et seq.) and the regulations of the Small Business Administration, hereinafter referred to as "SBA".

2. The gross revenue of plaintiff Ray Baillie Trash Hauling, Inc., hereinafter referred to as "Baillie", for its most recent fiscal year was approximately $75,000; for plaintiff Leonard Santo, hereinafter referred to as "Santo", approximately $155,000; and for plaintiff G. Lewis Jones, hereinafter referred to as "Jones", approximately $125,000.

3. Defendant All American Waste, Inc., hereinafter referred to as "All American", is also engaged in the business of collecting and hauling refuse as a small business concern in competition with each of the plaintiffs, and its annual gross revenue approximates $100,-000.

4. Defendant All American was formed and began operation in 1970 solely through financial aid and other assistance extended to it by defendant Thomas S. Kleppe, Administrator of the Small Business Administration, hereinafter referred to as "Administrator", and defendant Robert C. Seamans, Jr., Secretary of the Department of the Air Force, hereinafter referred to as "Secretary". As part of such aid and assistance, the Administrator and Secretary secured for SBA from Homestead Air Force Base, Homestead, Florida, hereinafter referred to as "Homestead", a contract for the collection and removal of refuse from the Base for the period 1 July 1970 through 30 June 1971 at a price of $65,000 and then without public notice of any kind privately subcontracted it to defendant All American at the same price for its sole benefit. Defendant All American has since been operating under the contract and receiving the contract price.

5. Prior to 1970 said contract services had been formally advertised each year by Homestead for competitive bidding restricted to small business concerns, including plaintiffs, as part of the statutory program instituted by SBA and the Department of the Air Force n accordance with the declared policy of the Congress (15 U.S.C.A. § 631):

* * * that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise, to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government (including but not limited to contracts or subcontracts for maintenance, repair, and construction) be placed with small-business enterprises, to insure that a fair proportion of the total sales of

Government property be made to such enterprises, and to maintain and strengthen the overall economy of the Nation.

6. In 1969 plaintiff Santo was the successful bidder and received the contract at a price of $49,116.00. In 1968 plaintiff Jones was the successful bidder and received the contract at a price of $42,245.00. The $65,000 price awarded to defendant All American includes a premium designed to enhance its competitive position against plaintiffs and other similarly situated small business concerns.

7. The Homestead contract because of its size and annual occurrence represents a significant part of the business available to each plaintiff. In size, it represents 45% to 85% of the gross annual revenues of each plaintiff.

8. In 1970, subsequent to receiving the Homestead subcontract, defendant All American by offering lower prices caused plaintiff Baillie to lose several large accounts to defendant All American. At such time Baillie's monthly gross revenues amounted to approximately $6,000, and the loss of the aforesaid accounts deprived it of approximately 40% of its gross revenues. Defendant All American is presently competing against plaintiffs for their individual commercial accounts.

9. Upon learning that the Administrator and Secretary were planning to arrange for a second subcontract to All American at Homestead for fiscal year 1971 (1 July 1971 through 30 June 1972), plaintiffs demanded that each be given the opportunity to compete for such an award. This demand was rejected.

10. On learning that the defendant Administrator and Secretary had concluded their plan to benefit defendant All American by executing a written agreement with it for the fiscal year 1971–1972, despite assurances to plaintiffs that an agreement would not be entered into with said defendant pending resolution of plaintiffs' protest then

before the Comptroller General of the United States, plaintiffs instituted this suit alleging that said agreement was illegal and that their rights under the United States Constitution had been violated. Thereafter, this Court entered on 1 July 1971 with the consent of the parties its order directing that performance of the subcontract executed with defendant All American on June 22, 1971 be held in abeyance for 30 days and that the prior contract with defendant All American could be extended by defendants until further order of the Court. The provisions of said order have been extended from time to time so that the order of the Court presently provides for a terminal date of October 25, 1971.

11. Defendants contend that they have been authorized by Congress to enter upon and carry out a program to aid "socially or economically disadvantaged persons" by the private placement with such individuals or firms as are selected by defendant Administrator of subcontracts for goods, services, or other matters covered by prime contracts secured by defendant Administrator from the various departments and agencies of the United States Government. In direct support of such asserted authority defendants rely upon the language of 15 U.S.C.A. § 637(a), Section 8(a) of the Small Business Act, Public Law 85–536, 72 Stat. 384, July 18, 1958, and implementing regulations adopted by the SBA effective November 10, 1970, Title 13 Code of Federal Regulations § 124.8–1 *et seq.* Defendants refer to this program as the "8(a)" program and it will be referred to in such terms to refer to the statute and applicable regulations as well.

12. SBA's current 8(a) regulations (13 C.F.R. 124.8–1 *et seq.*) set forth the following criteria for determining who are "socially and economically disadvantaged persons" eligible for 8(a) program benefits:

> To be eligible for an 8(a) subcontract, a concern must be owned or destined to be owned by socially or economically disadvantaged persons.

This category often includes, but is not restricted to Black Americans, American Indians, Spanish Americans, Oriental Americans, Eskimos and Aleuts. If a concern is not presently controlled by such persons, the firm having such control must execute a divestiture agreement providing for divestiture of control by the divesting company over the concern within a reasonable period of time. The existence of control is a question of fact for administrative determination under the circumstances of each case. Divestiture of at least 51 percent of the stock will create a rebuttable presumption of divestiture of control.

13. In support of their Motion To Dismiss Or, In The Alternative, For Summary Judgment, defendants have filed the affidavit of John T. Scruggs, Chief of the Procurement and Management Assistance Division of the Atlanta Regional Office of the SBA, sworn to on 6 August 1971. In his affidavit Mr. Scruggs has deposed as follows:

10. In determining whether one is socially or economically disadvantaged, reliance is not placed on a single factor but rather on a composite of all of the factors. In addition, the Regulations promulgated with respect to 8(a) contracts apply equally to members of all races. Thus, a Caucasian may be found to be socially or economically disadvantaged and thereby eligible for participation in this program. Moreover, within my jurisdiction the Agency has awarded approximately 225 8(a) contracts. Of this number, 212 were awarded to Black Americans, eight to Spanish-Americans, two to American Indians, and three were awarded to Caucasians.

14. In Kleen-Rite Janitorial Services, Inc. v. Melvin Laird, Secretary of Defense, et al. (United States District Court for the District of Massachusetts, Civil Action No. 71–1968–W), SBA caused to be filed in that suit the affidavit of David C. Buell, Chief of the Procurement and Management Assist-

ance Division for its Boston Regional Office, sworn to on 20 September 1971. Mr. Buell deposed as follows:

8. In determining whether one is socially or economically disadvantaged, reliance is not placed on a single factor but rather on a composite of all of the factors. In addition, the Regulations promulgated with respect to 8(a) contracts apply equally to members of all races. Thus, a Caucasian may be found to be socially or economically disadvantaged and thereby eligible for participation in this program. Moreover, I am informed and believe the fact to be that since the inception of the 8(a) program in 1968 through August 31, 1971, 795 small business firms have been awarded 1,153 8(a) contracts of a total value of $115,449,027. A statement showing the totals for each fiscal year is attached as Exhibit 1. I am further informed and believe that many of these firms are owned by Black Americans; others are owned by Caucasians; others owned by Mexican-Americans, American Indians, Oriental-Americans, and others of varied racial and ethnic backgrounds. The ownership of many of these firms was divided between persons of one, two or more of these various groups.

The exhibit referred to sets forth the following tabulation:

| FISCAL YEAR | NUMBER CONTRACTS AWARDED | VALUE | NUMBER OF COMPANIES |
|---|---|---|---|
| 1968 | 8 | $ 10,493,524 | 7 |
| 1969 | 30 | 8,884,141 | 23 |
| 1970 | 196 | 22,208,069 | 145 |
| 1971 | 811 | 66,120,409 | 523 |
| 1972 to 8/31/71 | 108 | 7,742,884 | 97 |
| Totals | 1,153 | $115,449,027 | 795 |

15. The language of the 8(a) regulation and the depositions by Mr. Scruggs and Mr. Buell comprise all of the evidence relating to criteria used by SBA in determining who is "socially or economically disadvantaged" and who from this class may receive the benefits of the 8(a) program.

16. The affidavit of Mr. Buell makes it clear that SBA, with the assistance of other departments and agencies of the United States Government, began the 8 (a) program in 1968 and that 196 subcontracts had been privately placed under the 8(a) program as of 30 June 1970.

17. Prior to 10 November 1970, on which date the present 8(a) regulation became effective (Finding 11), the SBA regulation applicable to Section 8(a) of the Small Business Act provided in pertinent part as follows, effective 31 December 1968:

§ 124.8–1 *Introduction.* (a) Section 8(a) (1) and (2) of the Small Business Act authorizes SBA to contract with any department or agency of the United States Government for the furnishing of articles, equipment, supplies or materials and to subcontract with small business concerns or others for the performance of such prime contracts.

(b) This prime contracting authority has been placed on a standby basis and will be activated as required to protect the interests of small business.

§ 124.8–2 *Procedures.* (a) During periods of emergency determined by the Administrator to warrant exercise by SBA of its prime contract authority, SBA will review procurement plans and programs of other Government departments and agencies to determine the contracts for property, equipment, supplies, or materials which SBA should undertake to furnish to the Government through the exercise of its prime contracting authority. Upon making such determination, SBA will make the certification provided for in section 8(a) (1) of the Small Business Act and will enter into a formal contract with the procuring agency. Thereafter, SBA will widely publicize its requirements and fully utilize its facilities listing in soliciting bids or proposals. Awards will then be made to the best qualified supplier, price and other factors considered.

(b) Standard Government procurement contracts, forms and procedures applicable to civilian agencies in effect at the time of such contracting will be utilized by SBA in making prime contracts or subcontracts.

18. This 8(a) regulation, hereinafter referred to as the "original" 8(a) regulation, to distinguish it from the version substituted as of 10 November 1970, hereinafter referred to as the "substitute" 8(a) regulation, was first adopted as of 31 December 1968 and remained in effect except for minor modification until the substitute 8(a) regulation was adopted as of 10 November 1970.

19. The original 8(a) regulation was promulgated contemporaneously with the passage by Congress of the Small Business Act, approved 18 July 1958, P. L. 85–536, 72 Stat. 384. Prior to the passage of this statute SBA reported to Congress, which was at the time considering amendments to the Small Business Act of 1953 (Title II of Act of 30 July 1953, 67 Stat. 232) which contained the substantive provisions of the present Section 8(a) in sections 207(c), (d) and 208, that SBA "believes that its authority to take prime contracts [pursuant to these sections] in order to extend subcontracting should be continued on a standby basis, for use in emergencies."

20. SBA's then stated belief that the 8(a) power was intended by Congress to be reserved for emergencies is confirmed by the legislative history attending the creation of the power by Congress. The power was initially entrusted to the Small Defense Plants Administration (SDPA) during the Korean War, to terminate on 30 June 1953, Defense Production Act Amendments of 1951, 31 July 1951, P.L. 96, 65 Stat. 131, 144. Concerned by the by-passing of small business in the Government's drive to achieve urgent war production, Congress stated that it was the "sense of the Congress that small-business concerns be encouraged to make the greatest possible contribution toward achieving the objectives of this Act." (Section 110, De-

fense Production Act Amendments of 1951, *supra*). Congress created SDPA to carry out its ·policy and gave to that agency the prototype of the power now reposed in SBA by means of section 8 (a). Defense Production Act Amendments of 1951, 65 Stat. 140, 141, §§ 714 (b) (1) (B), (C), and 714(b) (2).

21. The power granted to SDPA had its origin in legislation sponsored by Senator Sparkman and Representative Patman. These gentlemen were respectively chairmen of the Senate and House Committees overseeing the interests and welfare of small business. In speaking to the bill which would enact an 8(a) power, Representative Patman advised, in part, the House of Representatives as follows (Cong.Rec., Vol. 97, Part 1, pp. 410, 412):

> * * * This would enable the Small Defense Plants Corporation to act as a Government prime contractor and to sublet to small business concerns who would act as subcontractors to the Corporation. This very important provision was added to the Smaller War Plants Corporation Act after its original passage and proved to be extremely beneficial to small business. Actually, the Smaller War Plants Corporation took over very few contracts, but the power was there to do so if necessary and was, in effect, notice to the procuring agencies to award small business a fair proportion of the prime contracts. It is an effective provision by which the end result can be obtained, without its being used to any appreciable extent (section 3).

22. The statute creating the power given to SDPA expressly provided that it could be exercised "without regard to any provision of law except the regulations prescribed under Section 201 of the First War Powers Act, 1941, as amended." President Truman, acting pursuant to section 201 of the First War Powers Act, 1941, as amended, issued Executive Order No. 10210, February 2, 1951, 16 F.R. 1049, by which he authorized the Department of Defense [and thereafter other specified agencies] to exercise the extraordinary contract powers granted by section 201. In said Executive Order he specifically provided:

> 5. Advertising, competitive bidding, and bid, payment, performance or other bonds or other forms of security need not be required.

23. Congress in reposing the 8(a) power in SBA restricted the power by removing from it the right to exercise it without regard to any other provision of law. In the circumstances, the original 8(a) regulation promulgated by SBA, effective 31 December 1958 (Finding 17), represented a contemporaneous and accurate expression of the intention of Congress that the 8(a) power in the Small Business Act (1958) was one to be exercised in the event of emergency for the benefit of small business as a class, and that when exercised subcontracts must be entered into on a publicized, competitive basis.

24. This contemporaneous interpretation justified the repeated explication by Congress that the Government's business shall be, unless specifically excepted, carried on by means of the maximum competitive bidding practicable, whether formal advertising or negotiation is used (10 U.S.C.A. § 2304, 41 U.S. C.A. § 252, and implementing regulations of the Department of Defense and the General Services Administration). Most recently Congress, in creating a Commission of Government Procurement, has stated its policy as follows (41 U.S.C.A. § 251 note, November 26, 1969, P.L. 91–129, 83 Stat. 269):

> Section 1 [Declaration of policy]. It is hereby declared to be the policy of Congress to promote economy, efficiency, and effectiveness in the procurement of goods, services and facilities by and for the executive branch of the Federal Government by—
>
> (1) establishing policies, procedures, and practices which will require the Government to acquire goods, services, and facilities of the requisite quality and within the

time needed at the lowest reasonable cost, utilizing competitive bidding to the maximum extent practicable;

25. The fact that SBA instituted its subcontracting program for "socially or economically disadvantaged persons" in 1968 at a time when its original 8(a) regulation spoke clearly to other purposes and unequivocally required the maximum competition practicable among small business as a class, makes it appear that SBA did not then view the program as falling within the limits of the 8(a) power. Obviously, unless SBA is to be charged with wilful violation of its own regulations, it must be assumed to have acted upon some other asserted legal basis than the 8(a) power.

26. Congress has considered the plight of the poor and disadvantaged on numerous occasions. In the Economic Opportunity Act of 1964, as amended in 1967, 42 U.S.C.A. § 2701 *et seq.*, it has made provision for assistance to such individuals. In subchapter IV of this Act it has empowered SBA to provide financial assistance by means of loans and grants to small business firms in areas with high proportions of unemployed or low-income individuals, or which are owned by low income individuals; but it has specifically stated that such financial assistance shall "not include the procurement of plant or equipment, or goods or services." 42 U.S.C.A. §§ 2901, 2949(2).

27. Defendants have not offered any evidence that Congress has specifically approved, much less considered, a private subcontracting program such as SBA with the active assistance of other Government departments and agencies is carrying on under color of the 8(a) statute. Defendants do not contend, nor have they offered any evidence that individual members of the so-called "minority" groups identified in substitute regulation 8(a) have been discriminated against in the formation and operation of small business concerns by reason of race, color or ethnic origin.

28. Plaintiff firms are owned and controlled by "whites". Defendant All American is a firm owned and controlled by a "black". It appears that SBA with the active assistance of other Government agencies is operating its 8(a) program in such a manner as to provide merely token eligibility for "whites", and that plaintiffs are effectively barred from sharing in the benefits of such a program by reason of race and color, although they are similarly situated with defendant All American as small business concerns.

29. Defendant Administrator and defendant Secretary are actively supporting and assisting defendant All American by means of their lending and contract powers for the purpose of enhancing its viability and competitive position as against plaintiffs and other similarly situated small business concerns, and the basis for so favoring defendant All American is the race or color of the individual owning or controlling it.

30. Defendants' actions have and are causing injury to plaintiffs' economic interests and have and are depriving plaintiffs of the benefits extended to them as small business concerns by Congress.

*Conclusions of Law*

1. Plaintiffs have legal standing and interest to bring this suit, and the Court has jurisdiction of the parties and subject matter involved in this suit.

2. Congress has by means of the Small Business Act provided important and valuable benefits for small business concerns as defined by defendant Administrator. These benefits include the right to compete for Government contracts on an equal basis with other small business concerns. The setting aside by defendant Administrator and defendant Secretary, prior to the events here involved, of the Homestead contract for competition among small business concerns and award to the suc-

cessful bidder carried out the intent of Congress in this respect.

■ 3. It is also the general policy of Congress that Government contracts, unless specifically excepted, shall be awarded by means of the maximum competitive bidding practicable, whether formal advertising or negotiation is used. This policy is made binding by applicable statute upon the defendant Administrator and defendant Secretary in the making of contract awards. Section 8(a) of the Small Business Act does not create an exception to the statutes requiring the maximum competitive bidding practicable.

■ 4. The private award of subcontracts to defendant All American by the defendant Administrator with the active assistance of the defendant Secretary constituted a violation of the statutory requirements obligating them to secure the maximum competitive bidding practicable, and arbitrarily and capriciously deprived plaintiffs of the benefits extended to them by Congress by means of the Small Business Act. The subcontracts are unauthorized by law and illegal.

■ 5. Further, the legislative and regulatory history of the enactment and implementation of Section 8(a) of the Small Business Act demonstrates that Congress did not authorize by its provisions a program by defendant Administrator for the benefit of "socially or economically disadvantaged persons" as provided for and operated by defendant Administrator under color of Section 8 (a). The substitute 8(a) regulation represents an attempt at legislation and usurps the power residing solely in Congress. The substitute regulation and the program carried on under color of its provisions are unauthorized and illegal.

■ 6. The 8(a) program as carried on by defendant Administrator is also invalid and illegal in that it lacks objective criteria other than those of race, color or ethnic origin for the identification of those persons who are deemed to be "socially or economically disadvantaged" and otherwise eligible to receive contract awards from the defendant Administrator without competition. Plaintiffs are small business concerns similarly situated with defendant All American, but defendants in the operation of the 8(a) program ignore such a factor.

■ 7. The primary criterion for eligibility under the 8(a) program is race, color or ethnic origin. "Whites" are not eligible for the program benefits, except on a token basis. Plaintiffs have been excluded from consideration for the Homestead awards because of their race and color. There is no evidence that members of the "minority" groups identified in substitute regulation 8(a) have been discriminated against in the formation and operation of small business concerns by reason of race, color or ethnic origin. The exclusion of "whites", and specifically plaintiffs, from participation in the 8(a) program, except on a token basis, represents invidious discrimination against them. In this respect plaintiffs' rights under the competitive bidding statutes and the Small Business Act have been violated by the actions of the defendants, as have their right to receive equal protection of the laws pursuant to the Fifth and Fourteenth Amendments to the Constitution of the United States.

■ 8. Defendant Administrator's and defendant Secretary's use of Government lending and contracting powers to favor defendant All American by enhancing its competitive advantage against plaintiffs in the private commercial field violates plaintiffs' rights under the Fifth Amendment to the Constitution of the United States in that it serves to deprive them of their property without due process of law.

### Judgment

It is hereby ordered, adjudged and decreed this day of October, 1971, that plaintiffs have judgment in their favor, that the subcontracts awarded by defendant Administrator to defendant All

American are unauthorized by law and illegal, and that the Homestead services shall be contracted for as soon as possible on the basis of the maximum competitive bidding practicable among plaintiffs and other similarly situated small business concerns.

The Court's order of 8 October 1971, is hereby dissolved.

Jurisdiction is retained for such further relief as may appear just and equitable in the premises.