**RAY BAILLIE TRASH HAULING, INC., et al., Plaintiffs-Appellees,**

v.

**Thomas S. KLEPPE, Administrator, Small Business Administration, et al., Defendants-Appellants.**

No. 72–1163.

United States Court of Appeals, Fifth Circuit.

April 18, 1973.

Rehearing and Rehearing En Banc

Denied June 18, 1973.

---

gram for awarding government procurement contracts to small business concerns owned by "socially or economically disadvantaged persons." 13 C.F.R. § 124.8–1(c). The district court held that the section 8(a) program is not authorized by statute and denies due process and equal protection in violation of the Fifth and Fourteenth Amendments. We reverse.

Robert W. Rust, U. S. Atty., Chief, Civil Div., Clemens Hagglund, Asst. U. S. Atty., Miami, Fla., John N. Mitchell, U. S. Atty. Gen., Dept. of Justice, Thomas S. Kleppe, Administrator, S. B. A., Walter H. Fleischer, Joseph B. Scott, Dept. of Justice, Washington, D. C., for defendants-appellants.

Alexander Boskoff, Washington, D. C., Bernard Jaffe, Miami, Fla., for plaintiffs-appellees.

Before WISDOM, THORNBERRY and GODBOLD, Circuit Judges.

WISDOM, Circuit Judge:

On reconsideration sua sponte, we withdraw our opinion dated January 5, 1973 and issue the following opinion.

\* \* \*

In this case the plaintiffs attack the Small Business Administration's pro-

## I.

The plaintiffs-appellees, Ray Baillie Trash Hauling, Inc., Leonard Santo, d/b/a L & J Waste Service, and C. Lewis Jones, d/b/a Southern Florida Sanitation Company of Dade County, Inc., are engaged in the business of collecting and hauling refuse to disposal sites. They qualify as small business concerns under both the Small Business Act, 15 U.S.C. § 631 et seq.,[1] and the applicable regulations of the Small Business Administration. All American Waste, Inc., named as a defendant, is a black-owned firm that competes with the plaintiffs in the business of collecting and hauling refuse and also qualifies as a small business concern. The dispute in the present case relates to a contract for the collection and removal of refuse from Homestead Air Force Base in Homestead, Florida. In 1968 and 1969, the Small Business Administration and the Department of the Air Force, pursuant to a joint program,[2] set aside the contracts

---

1. Section 2 of the Small Business Act defines "small business concerns" as follows:

    For the purposes of this chapter, a small-business concern shall be deemed to be one which is independently owned and operated and which is not dominant in its field of operation. In addition to the foregoing criteria the Administrator, in making a detailed definition, may use these criteria, among others: Number of employees and dollar volume of business. Where the number of employees is used as one of the criteria in making such definition for any of the purposes of this chapter, the maximum number of employees which a small-business concern may have under the definition shall vary from industry to industry to the extent necessary to reflect different

    characteristics of such industries and to take proper account of other relevant factors. Pub.L. 85–536, § 2 [3], July 18, 1958, 72 Stat. 384.
    15 U.S.C. § 632.

2. Section 8(b)(11) of the Small Business Act authorizes the SBA to set aside contracts for placement with small business concerns. The SBA has the power:

    (11) to make studies and recommendations to the appropriate Federal agencies to insure that a fair proportion of the total purchases and contracts for property and services for the Government be placed with small-business enterprises, to insure that a fair proportion of Government contracts for research and development be placed with small-business concerns, to insure that a

for placement with small business concerns. The Air Force awarded the contracts after formal advertising and competitive bidding restricted to small business concerns. Jones and Santo successfully bid for the contract in 1968 and 1969 respectively.[3]

In 1970, the Small Business Administration promulgated new regulations establishing a "section 8(a) program" providing for assistance to small business concerns owned by disadvantaged persons. 13 C.F.R. § 124.8–1. As part of the program, the SBA secured a prime contract from the Air Force for the collection and removal of refuse from the Homestead base for a two year period commencing July 1, 1970. The SBA then negotiated a similar subcontract with All American for the performance of the services in the prime contract between the SBA and the Air Force for a one year period commencing July 1, 1970 at $65,000.[4]

Upon being advised that the SBA intended to enter into a second subcontract with All American for the performance of the prime contract services at Homestead for the fiscal year 1971, the plaintiffs demanded an opportunity to compete for the contract. They did not apply for participation in the program and they did not contend that they were eligible. The SBA rejected the demand and later executed the second subcontract with All American. On June 29, 1971, the plaintiffs commenced the present action for injunctive and declaratory relief in the District Court for the Southern District of Florida. The defendants were the Administrator of the Small Business Administration, the Secretary of the Department of the Air Force, the Contracting Officer assigned to Homestead Air Force Base, and All American Waste, Inc. In the complaint, the plaintiffs sought a permanent injunction enjoining the SBA from letting the Homestead contract under the section 8(a) program without competitive bidding. At the same time, they filed a motion for a temporary restraining order and a preliminary injunction.

With the consent of the parties, the district court issued an order directing that the second subcontract be held in abeyance for thirty days and that the prior contract with All American be extended until further order. Later orders of the court extended this period until judgment on the merits.

On October 29, 1971, the district court entered its judgment. 334 F.Supp. 194. The court found that the SBA's section 8(a) program, providing for assistance to small business concerns owned by disadvantaged persons, was not authorized by the Small Business Act and violated the federal statutes requiring competitive bidding in government procurement. The court also found that the primary criterion for the program was race, color, and ethnic origin, that whites were ineligible for program benefits except on a token basis, and that the plaintiffs, as "non-minority" owned firms, were denied due process and equal protection of the laws. The court concluded that the subcontract awarded to All American was illegal and ordered that the Homestead contract be awarded as soon as possible on the basis of the maximum competitive bidding practicable among the plaintiffs and other similarly situated small business concerns. The defendants appealed.

fair proportion of the total sales of Government property be made to small-business concerns, and to insure a fair and equitable share of materials, supplies, and equipment to small-business concerns;

15 U.S.C. § 637(b)(11).

3. In 1968, Jones was the successful bidder and received a contract price of $42,245. In 1969, Santo was the successful bidder and received a contract price of $49,166.

4. The SBA contends that the contract price was arrived at by computing estimated cost plus allowance for a reasonable profit. The district court found that the contract price includes a premium designed to enhance All American's competitive position against the plaintiffs and other similarly situated small business concerns.

## II.

At the outset, we must confront two questions relating to our ability to hear and decide the merits of the parties' contentions: first, whether the present case is moot; and second, whether the plaintiffs have standing to litigate the issues raised in their complaint.

The question of mootness arises from the fact that All American did not satisfactorily perform its responsibilities under the contract. The Air Force terminated the contract with All American on October 1, 1971, and has since negotiated a refuse contract, under 10 U.S.C. § 2304(a)(2), with one of the plaintiffs for the duration of the fiscal year 1972. A case is not moot, however, if there is a reasonable expectation that the act complained of will be repeated. United States v. W. T. Grant Co., 1953, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303. The Court has been advised that the SBA intends to continue its section 8(a) program, including future awards of the Homestead contract. We conclude, therefore, that a real controversy exists and that the appeal may proceed. See also, American Bible Society v. Blount, 3 Cir. 1971, 446 F.2d 588; Atlantic Richfield Co. v. Oil, Chemical and Atomic Workers International Union, AFL–CIO, 7 Cir. 1971, 447 F.2d 945.

The question of the plaintiffs' standing is considerably more difficult. In general, to have standing to litigate, a party must show that he has incurred, or is in immediate danger of incurring, some direct and personal injury resulting from the violation of a constitutional or statutory right designed to protect that party. Moose Lodge No. 107 v. Irvis, 1972, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627; Sierra Club v. Morton, 1972, 405 U.S. 727, 92 S.Ct. 1361, 31 L. Ed.2d 636; Laird v. Tatum, 1972, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154; Association of Data Processing Organizations, Inc. v. Camp, 1970, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184; Barlow v. Collins, 1970, 397 U.S. 159, 90 S.Ct.

832, 25 L.Ed.2d 192. To be sure, even a slight injury may suffice in some circumstances. See Flast v. Cohen, 1968, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947. Yet the fundamental principle remains inviolate: one who has no personal stake in the outcome of the controversy always lacks standing.

In the case at bar, the plaintiffs challenge the SBA's section 8(a) program on two separate grounds. First, the plaintiffs contend that the SBA lacked the statutory and constitutional authority to establish its section 8(a) program. Second, assuming there is authority for establishing the section 8(a) program, the plaintiffs contend that the SBA has administered the program in an unconstitutional manner by discriminating on the basis of race, color, or ethnic origin.

Turning to the first of these issues, we conclude the plaintiffs have standing to litigate the question of the statutory and constitutional authority for establishing the section 8(a) program. The plaintiffs allege not only that they have been injured by the SBA's action removing government procurement contracts from competitive bidding, but also that the section 8(a) program enabled All American to receive a premium price above that which would have prevailed under competitive bidding and that All American has since used this premium to submit low bids for private commercial contracts, thus causing the plaintiffs to lose some of their customers to All American. In these circumstances, the injury to the plaintiffs is manifest. Moreover, as small business concerns, the plaintiffs are arguably within the zone of interests intended to be protected by the Small Business Act. See Association of Data Processing Organizations, Inc. v. Camp, supra. We therefore find that the plaintiffs have standing to litigate the first issue. For the present, we pretermit the question of the plaintiffs' standing to litigate the issue of the SBA's alleged discrimination in administering the section 8(a) program.

## III.

As stated in the regulations promulgated by the SBA, the purpose of the section 8(a) program is "to assist small business concerns owned by disadvantaged persons to become self-sufficient, viable businesses capable of competing effectively in the market place." 13 C. F.R. § 124.8–1(b).[5] Authority for the program is derived from section 8(a) of the Small Business Act, 15 U.S.C. § 637(a),[6] empowering the SBA to enter into all types of contracts (including contracts for supplies, services, construction, research, and development) with other departments and agencies of the federal government and to arrange for the performance of such contracts by negotiating or otherwise letting subcontracts to small business concerns. In awarding subcontracts under the section 8(a) program, the SBA limits eligibility to small businesses "owned or destined to be owned by socially or economically disadvantaged persons." 13 C.F.R. § 124.8–1(c). As the regulations recognize, this "often includes, but is not restricted to, Black Americans, American Indians, Spanish Americans, Oriental Americans, Eskimos and Aleuts." *Id.*

The district court held that the SBA's section 8(a) program was statutorily

5. The regulations governing the section 8(a) program provides, in pertinent part:
§ 124.8–1
(a) *General.* Section 8(a) of the Small Business Act authorizes SBA to enter into all types of contracts (including supply, services, construction, research and development) with other Government departments and agencies and subcontract the preformance of such contracts.
(b) *Purpose.* It is the policy of SBA to use such authority to assist small concerns owned by disadvantaged persons to become self-sufficient, viable businesses capable of competing effectively in the marketplace.
(c) *Eligibility.* To be eligible for an 8(a) subcontract, a concern must be owned or destined to be owned by socially or economically disadvantaged persons. This category often includes, but is not restricted to, Black Americans, American Indians, Spanish Americans, Oriental Americans, Eskimos and Aleuts. If a concern is not presently controlled by such persons, the firm having such control must execute a divestiture agreement providing for divestiture of control by the divesting company over the concern within a reasonable period of time. The existence of control is a question of fact for administrative determination under the circumstances of each case. Divestiture of at least 51 percent of the stock will create a rebuttable presumption of divestiture of control.
(d) *Procurement selection criteria.* Procurements will be selected which are determined suitable for performance by an SBA subcontractor. However, procurements will not be considered where:
(1) Public solicitation has been issued;
(2) There is a reasonable possibility of an award being made to disadvantaged contractors under normal competitive procedures, or
(3) Where small business concerns are dependent in whole or in significant part on recurring Government contracts.

6. Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a), provides:
(a) It shall be the duty of the Administration and it is empowered, whenever it determines such action is necessary—
(1) to enter into contracts with the United States Government and any department, agency, or officer thereof having procurement powers obligating the Administration to furnish articles, equipment, supplies, or materials to the Government. In any case in which the Administration certifies to any officer of the Government having procurement powers that the Administration is competent to perform any specific Government procurement contract to be let by any such officer, such officer shall be authorized in his discretion to let such procurement contract to the Administration upon such terms and conditions as may be agreed upon between the Administration and the procurement officer; and
(2) to arrange for the preformance of such contracts by negotiating or otherwise letting subcontracts to small-business concerns or others for the manufacture, supply, or assembly of such articles, equipment, supplies, or materials, or parts thereof, or servicing or processing in connection therewith, or such management services as may be necessary to enable the Administration to perform such contracts.

unauthorized, that the SBA's powers under section 8(a) of the Small Business Act are limited to periods of emergency, and that the SBA was bound by other statutes requiring government procurement contracts to be awarded competitively. We disagree.

A. The declared policy of the Small Business Act is to "aid, counsel, assist, and protect . . . the interests of small-business concerns in order to preserve free competitive enterprise [and] to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government . . . be placed with small-businesses enterprises." The Act is premised on the idea that "the essence of the American economic system of private enterprise is free competition," "[that] the preservation and expansion of such competition is basic not only to the economic well-being but to the security of this Nation," and that "[s]uch security and well-being cannot be realized unless the actual and potential capacity of small business is encouraged and developed." 15 U.S.C. § 631.

To accomplish this goal, Congress vested the Small Business Administration with broad powers and responsibility over the economic life of small business concerns. The SBA is authorized to make loans to small business concerns, to provide technical and managerial aids, and to assist small business concerns in obtaining government contracts. 15 U.S.C. §§ 636, 638, 644. Most importantly, in section 8(a) of the Act the SBA is authorized to enter into procurement contracts with other federal agencies and to arrange for the performance of those contracts by subcontracting with small business concerns. 15 U.S.C. § 637(a). This section unequivocally states that the SBA is empowered to let subcontracts to "small business concerns or others." 15 U.S.C. § 637(a)(2). In accordance with this statutory mandate, the SBA adopted its section 8(a) program through which government procurement contracts are awarded to small business concerns owned by disadvantaged persons.

█ The plaintiff contends, however, that the section 8(a) program is unauthorized because it is not specifically mentioned in the statute. This argument is without merit. The complex and volatile nature of problems, including allocation of government procurement contracts, often causes Congress to cast its statutory provisions in general terms, leaving to the agency the task of spelling out the specific regulations and programs.[7] In this manner, agency expertise may be fully employed in dealing with such problems. The agency may evaluate the competing alternatives and formulate the policy best suited to the attainment of the statutory goal. Furthermore, the agency is left free to respond to the demands of changing circumstances or conditions unanticipated by Congress. Indeed, an agency could easily be prevented from serving its intended purpose if burdened with specific statutory regulations and programs.

█ So it is with the case at bar. Congress has declared that the actual and potential capacity of small business concerns must be developed and that a fair proportion of total purchases and contracts of the federal government must be placed with such firms. 15 U.S.C. § 631. It has given the SBA the

7. See e. g., FTC v. Sperry Hutchinson Co., 1972, 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170; Permian Basin Area Rate Cases, 1968, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312; United States v. Southwestern Cable Co., 1968, 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001; American Trucking Ass'ns v. Atchison, T. & S. F. Ry., 1967, 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847; American Power & Light Co., 1946, 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103; Tagg Bros. & Moorhead v. United States, 1930, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524; FRC v. Nelson Bros. Bond & Mortgage Co., 1933, 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166; FTC v. Gratz, 1930, 253 U.S. 421, 40 S.Ct. 572, 64 L.Ed. 993; United States v. Shreveport Grain & Elevator Co., 1932, 287 U.S. 77, 53 S.Ct. 42, 77 L.Ed. 175; See K. Davis, Administrative Law Treatise, § 2.01–2.16.

statutory authority and necessary discretion in awarding subcontracts to accomplish that goal. The discretion as to which firms shall receive subcontracts and the decision as to what regulations shall govern procurement is left to the SBA. 15 U.S.C. § 637. It must select the programs that will insure the economic development of small business concerns and provide for their participation in government procurement contracts. The SBA has responded by adopting a program which reflects its judgment of priorities in light of current facts. It is not the duty of the courts to evaluate the arguments regarding allocation of government procurement contracts or to consider the wisdom of the present programs. American Trucking Ass'ns v. Atchison, T. & S. F. Ry., 1967, 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847.[8] Rather, our task is limited to determining whether the SBA has abused its discretion or exceeded its statutory authority in adopting the section 8(a) program. There is ample indication that small business concerns owned by disadvantaged persons have traditionally received a disproportionally small number of government procurement contracts.[9] It is certainly reasonable, therefore, for the SBA to make a special effort to alleviate this imbalance. Section 8(a) of the Act provides the authority to do so.

■ Furthermore, the plaintiffs cannot complain because a specific type of small business concern is the primary beneficiary of the present program. It is well settled that an agency need not "strike at all evils at the same time," Semler v. Dental Examiners, 1935, 294 U.S. 608, 610, 55 S.Ct. 570, 571, 79 L.Ed. 1086, but may "reform may take one

---

8. As the court noted in Kendler v. Wirtz, 3 Cir. 1968, 388 F.2d 381, 383,

> A mere difference of judgment between a person disadvantageously affected by agency action and the responsible head of the agency over the merits of particular administration action as a means of achieving a legislative objective, when Congress has assigned authority to make and act upon such determinations to the agency, is not judicially reviewable. . . . [T]he statutory standard is expressed in such general concepts that it requires and must contemplate the exercise of discretion in choice among various rational alternatives none of which can fully satisfy all demands of competing interests.

The area of government contract awards has long been recognized as one in which special deference should be shown to the discretion of the administrative agency. Perkins v. Lukens Steel Co., 1940, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108. The agency, of course, may not act arbitrarily. Scanwell Laboratories v. Shaffer, 1970, 137 U.S.App.D.C. 371, 424 F.2d 859; Gonzalez v. Freeman, 1964, 118 U.S. App.D.C. 180, 334 F.2d 570.

9. The limited extent to which minority business enterprises participate in federal government procurement indicates that these firms have received a disproportionately small number of contract awards. According to the Report of the President's Advisory Council on Minority Business Enterprise, at 5 (1971) "current figures place minority-owned businesses variously between 55,000 and 165,000, from a total of more than 5.5 million, or between one and three percent of the total business community." In Fiscal Year 1971 federal government procurement contracts let to minority-owned businesses (blacks, Indians, Puerto Ricans, Mexican Americans, and others) totalled $143.8 million. The SBA's section 8(a) program accounted for $66 million of this amount. Dept. of Commerce, Progress of the Minority Business Enterprise Program, at 9 (1972). The federal government's procurement contracting during this same period exceeded $45 billion. Secretary of the Defense, Military Prime Contract Awards and Subcontract Payments or Commitments—July 1970 - June 1971, at 7–8 (1971); General Services Administration, Procurement By Civilian Executive Agencies, Period July 1, 1970 - June 30, 1971, (1971). Thus, minority-owned businesses participated in about one-third of one percent of the total dollar volume of federal government procurement during the Fiscal Year 1971. Although no figures were presented comparing contract awards to non-minority-owned small business firms with awards to minority-owned small business firms, it is apparent that in general minority-owned small business firms have received a disproportionately small share of federal government procurement contracts.

step at a time, addressing itself to the phase of the problem which seems most acute." Williamson v. Lee Optical Co., 1955, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563. *See* Katzenbach v. Morgan, 1966, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828; Roschen v. Ward, 1929, 279 U.S. 337, 49 S.Ct. 336, 73 L.Ed. 722. Since the present program is a reasonable means of promoting the statutory goal, we find that the SBA has not abused its discretion or exceeded its statutory authority.

■ The SBA's program is also supported by congressional and presidential mandates issued after the passage of the Act.[10] The first of these mandates is contained in the 1967 Amendment to the Economic Opportunity Act,

42 U.S.C. § 2701 et seq. This amendment directs the SBA to "assist in the establishment, preservation, and strengthening of small business concerns . . . with special attention to small business concerns (1) located in urban or rural areas with high proportions of unemployed or low-income individuals, or (2) owned by low-income individuals."[11] 42 U.S.C. § 2901. In addition, the Administrator of the SBA is specifically instructed to "take such steps as may be necessary and appropriate, in coordination and cooperation with the heads of other Federal departments and agencies, *so that contracts, subcontracts, and deposits made by the Federal Government or in connection with programs aided with Federal funds are placed in such a way as to further the*

---

10. We hold that the Small Business Act alone provides sufficient authority for the SBA's section 8(a) program. We discuss these additional authorities, however, because we find they show convincingly that the SBA has not abused its discretion or exceeded its statutory authority.

11. The plaintiffs argue that the 1967 Amendment defines eligibility in terms of low-income, not social and economic disadvantage. 42 U.S.C. § 2901. The plaintiffs would conclude that the Amendment cannot provide support for the SBA's program. This restrictive interpretation fails for three reasons. First, the broad goal of the Economic Opportunity Act and the 1967 Amendment clearly contemplates that the beneficiaries of the Act need not be defined exclusively in terms of income. The Act states that its purpose is to eliminate "the paradox of poverty in the midst of plenty" and that the nation can achieve its economic and social potential only if "every individual has the opportunity to contribute to the full extent of his capabilities and to participate in the workings of our society." The Senate Committee on Labor and Public Welfare, in its Report on the 1967 Amendments to the Economic Opportunity Act, recognized that achievement of the statutory goal required that disadvantaged minorities be included in the programs established by the Act: "The Committee feels that an important priority of the anti-poverty effort must be to expand the opportunities for a stake in the community economic life for low-income persons *and minority group members*, especially in the urban ghetto." S.

Rep.No.563, 90th Cong., 1st Sess. 65 (1967). (emphasis added.)

Second, the House and Conference Reports of the 1967 Amendment state that the Administrator of the SBA has the responsibility for defining "low income", and that "such definition need not correspond with the definition of 'low income' as used elsewhere in the act." 1967 U.S. Cong. and Admin.News, pp. 2485, 2596; H.R. Final Report No. 866, 90th Cong., 1st Sess. (1967); Conference Report No. 1012, 90th Cong., 1st Sess. (1967), U.S. Code Cong. & Admin.News, p. 2428. When an administrative agency is charged with the responsibility for defining a broad statutory term, the agency's construction must be accepted if it has a reasonable basis in law. NLRB v. Hearst Publications, 1944, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170; Gray v. Powell, 1941, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301. The legislative history clearly indicates that factors other than income may be considered. Indeed, it is unlikely that many persons who own small businesses are impoverished in the strict sense. Even for the Act to have meaning, therefore, it is necessary to read the term "low-income individuals" in a broad manner. We conclude that the SBA's construction of the term has a reasonable basis in law.

Finally, the standards for determining eligibility under the SBA's section 8(a) program contemplate that income will be an important factor. 13 C.F.R. § 124.8–1. In these circumstances, we find plaintiffs' contention that the 1967 Amendment is inapplicable to be without merit.

*purposes of this subchapter."* 42 U.S.C. § 2906c(a). (emphasis added.)

In response, the plaintiffs contend that the Economic Opportunity Act prohibits the awarding of the subcontract in the present case since section 2949(2) provides that financial assistance may not include the procurement of plant or equipment, or goods or services. 42 U.S.C. § 2949(2). This section, however, clearly applies to grants in kind and does not preclude awards of subcontracts for the performance of services. On the contrary, financial assistance through contract awards is expressly approved by the Act. 42 U.S.C. § 2906c(a).

The presidential mandates for the SBA's section 8(a) program are found in Executive Orders 11458, 11518, 11625.[12] In the first order, issued March 5, 1969, the President instructed the appropriate federal departments and agencies to establish programs to strengthen minority business enterprise. Exec.Order No. 11458, 34 Fed.Reg. 4937 (1969). In the second order, issued March 21, 1970, the President called for increased representation of the interests of small business concerns, particularly minority-owned business concerns, within federal departments and agencies. Exec.Order No. 11518, 35 Fed.Reg. 4939 (1970). In the third order, issued October 13, 1971, the President directed all federal departments and agencies to "continue all current efforts to foster and promote minority business enterprises." Exec.Order No. 11625, 36 Fed. Reg. 19967 (1971). In terms substantially identical to the SBA's section 8(a) program, the order defines "minority business enterprise" as "a business enterprise that is owned or controlled by one or more socially or economically disadvantaged persons." *Id.*

The SBA's section 8(a) program clearly promotes the goals articulated in both the 1967 Amendment to the Economic Opportunity Act and the executive orders. We conclude that there is ample support for the section 8(a) program.

B. In reaching the conclusion that the SBA's powers under section 8(a) of the Small Business Act may be used only in periods of emergency, the district court relied on the fact that the statutory prototype of section 8(a), sections 714(b)(1)(B), (C), and 714(b)(2) of the Defense Production Act Amendments of 1951, was first enacted to increase the participation of small business concerns in the production of war material during the Korean War.[13] De-

12. The SBA's section 8(a) program was instituted in 1968. The plaintiffs argue that executive orders issued after that date cannot be considered in determining the authority for the program. We find this contention unsupported. The relevant period for the present case is the date when the second Homestead contract was awarded, 1971. Since the executive orders were issued before that date, they may be considered as authority. Furthermore, we note that executive orders have the force and effect of law. *See* Farkas v. Texas Investment Corp., 5 Cir. 1967, 375 F.2d 629, cert. denied 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471.

13. The Defense Production Act Amendments of 1951 were designed to insure the participation of small business concerns in the production of material for the Korean War. The Amendments authorized the Small Defense Plants Administration (SDPA) to enter into contracts with other government agencies and to subcontract with small business concerns "without regard to any other provision of law except the regulations prescribed under Section 201 of the First War Powers Act, 1944, as amended." Act of July 31, 1951, ch. 275, § 110, 65 Stat. 140–141. Section 201 of the War Powers Act authorized contracting "without regard to the provisions of law relating to the making, performance, amendment or modification of contracts," whenever such action would facilitate the prosecution of the war. On February 2, 1951, President Truman issued Executive Order No. 10210, 16 Fed.Reg. 1049, authorizing certain federal agencies, including the Department of Defense, to exercise the subcontracting power granted by section 201. The order stated that "advertising competitive bidding, and bid, payment, performance or other bonds or other forms of security need not be required."

In 1953, Congress established the Small Business Administration as the peacetime

fense Production Act Amendments of 1951, 65 Stat. 140, 141, §§ 714(b)(1)(B), (C), and 714(b)(2). In addition, the court noted that the regulations first promulgated by the SBA after the passage of section 8(a) stated that the authority to subcontract would be used only in periods of emergency. 13 C.F.R. § 124.8-1 (1958).[14]

We are not persuaded by this restrictive interpretation of section 8(a). There can be no more reliable an indication of legislative intent than the specific statutory words selected by Congress in delineating the powers conferred. Section 8(a) unambiguously provides that the SBA is empowered to act "whenever it determines that such action is necessary." 15 U.S.C. § 637(a). This broad mandate answers the argument that Congress intended to restrict section 8(a) to periods of emergency.[15]

---

successor to the SDPA. The Small Business Act of 1953 conferred the subcontracting power upon the SBA but did not state, as did the earlier Amendments, that it could be exercised "without regard to any other provision of law." Act of July 30, 1953, ch. 282, 67 Stat. 235.

In 1958, Congress enacted the second Small Business Act. The Act provided that the SBA could use the subcontracting power "whenever it determines that such action is necessary" and that it could arrange for the performance of subcontracts "by negotiating or otherwise letting" 15 U.S.C. § 637(a)(2).

14. The 1958 regulations provided, in pertinent part:

13 C.F.R. § 124-8.1

(a) During periods of emergency determined by the Administrator to warrant exercise by SBA of its prime contract authority, SBA will review procurement plans and programs of other Government departments and agencies to determine the contracts for property, equipment, supplies, or materials which SBA should undertake to furnish to the Government through the exercise of its prime contracting authority. Upon making such determination, SBA will make the certification provided for in section 8(a)(1) of the Small Business Act and will enter into a formal contract with the procuring agency. Thereafter, SBA will widely publicize its requirements and fully utilize its facilities listing in soliciting bids or proposals. Awards will then be made to the best qualified supplier, price and other factors considered.

The regulations promulgated by the SBA in 1970, of course, contain no such limitation. Congress has often criticized the SBA's initially restrictive interpretation of its powers. See note 15 infra. The SBA is certainly entitled to re-evaluate its position in these circumstances. As the Supreme Court noted in American Trucking Ass'n v. Atchison, T. & S. F. Ry., 1967, 387 U.S. 397, 416–417, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847,

[W]e agree that the Commission, faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice. [citing cases]. In fact, . . . this kind of flexibility and adaptability . . . is an essential part of the office of a regulatory agency.

15. Congress has stated on several occasions that section 8(a) can be used peacetime. In 1960, for example, the Final Report of the Select Committee on Small Business, referring to the SBA's initial position that section 8(a) could be used only in periods of emergency, stated:

It is the conclusion of the committee that the [SBA's] interpretation of this Section is too narrow and limited; *that it was the intention of Congress that it would be used whenever necessary to assure that small business receives its fair share of Government procurement and not just in 'national emergency.'* The committee believes that small business is not getting its fair share, and that there could very well be instances wherein the assuming of prime contracts by SBA for the purpose of letting subcontracts to small businesses would be feasible.

H.R.Final Rep.No. 2235, 86th Cong., 2d Sess. 81 (1960) (emphasis added.) *See* Hearings before Subcomm. of the Comm. on Banking and Currency, 87th Cong., 1st Sess., at 262–264 (1961); Hearings on H.R. 4525 Before the Comm. on Banking and Currency, 84th Cong., 1st Sess., at 97 (1955).

The plaintiffs point out that the SBA, in a report presented to the House Committee considering the legislation which became the Small Business Act of 1958, stated that it believed its authority to subcontract was limited to periods of emergency. In American Trucking Ass'n v. Atchison, T., & S. F. Ry., *supra*, the Su-

**708**

We therefore conclude that the SBA's authority to use its powers under section 8(a) is not limited to periods of emergency.

C. As an additional ground for its decision, the district court held that section 8(a) prohibits the SBA's action awarding the Homestead contract to All American without formal advertising or competitive bidding. Again, we disagree.

Section 8(a) empowers the SBA to arrange for the performance of prime contracts by "negotiating or otherwise letting subcontracts." 15 U.S.C. § 637(a)(2). The statute does not require the SBA to engage in competitive bidding. The plaintiffs contend, however, that to construe the phrase "or otherwise letting" as permitting the SBA to dispense with competition would be inconsistent with the congressional intent expressed in other statutes requiring competition in government procurement. These statutes recognize, however, that competition may be dispensed with when other statutes so provide, 41 U.S.C. § 252(c)(15),[16] or when the purposes of the relevant program make it impractical to secure competition. 41 U.S.C. § 252(c)(10). Both exceptions are applicable here.

First, section 8(a) of the Small Business Act clearly constitutes specific statutory authority to dispense with competition. 15 U.S.C. § 637(a). It provides that the SBA may let subcontracts by negotiation or any other method.

Second, competition is impractical in the present case. The purpose of the Act is to assist small business concerns. The Act is based on the premise that such firms are unable to compete effectively in the marketplace and therefore cannot secure government procurement contracts awarded through competitive bidding. By increasing their participation in government procurement, however, these firms can eventually become self-sufficient, viable businesses capable of competing effectively in the marketplace. Private negotiation of subcontracts is the best means of accomplishing this goal.[17] To require competitive bidding would be contrary to the basic rationale of the Act. Even if competition were limited to small business concerns, there would still be many small business concerns that would never receive government procurement contracts. This result would clearly frustrate the congressional intent to assist small businesses.

Kleen-Rite Janitorial Services, Inc. v. Laird, D.Mass.1971, [September 21, 1971, No. 71–1968], supports the SBA's authority to institute the section 8(a) program. In *Kleen-Rite*, the plaintiff sought to enjoin the SBA and the Department of Defense from awarding a subcontract for janitorial services to a small business concern owned by socially

---

preme Court commented on the reliability of such reports in determining legislative intent:

> We do not regard [an agency's report to Congress] as legislative history demonstrating a congressional construction of the meaning of the statute. . . . The advocacy of legislation by an administrative agency—and even the assertion of the need for it to accomplish a desired result—is an unsure and unreliable, and not a highly desirable, guide to statutory construction. 387 U. S. at 417, 87 S.Ct. at 1619.

16. The Federal Property and Administrative Services Act of 1949, 41 U.S.C. § 252

(c)(15), provides that competition may be dispensed with where negotiation is "otherwise authorized by law." The regulations promulgated pursuant to the Act cite several examples, including "negotiation permitted by the Small Business Act." 41 C.F.R. § 18–3.217–3.

17. The 1967 Amendments to the Economic Opportunity recognized this fact by specifying that subcontracts were to be *"placed* in such a way as to further the purposes of this subchapter." 42 U.S.C. § 2906c(a). Again, Congress avoided imposing any requirement of competitive bidding on the SBA in awarding subcontracts under the program.

and economically disadvantaged persons. In denying the injunction, the court held that the SBA had specific statutory authority to administer its section 8(a) program and that there was no statutory or constitutional duty to offer the subcontract for competitive bidding.

Space Services of Georgia, Inc. v. Laird, D.C.D.Conn.1972, [No. 15,170; August 17, 1972] and Fortec Constructors v. Kleppe, D.D.C.1972, 350 F.Supp. 171, also uphold the legality of the section 8(a) program. The present case is on all fours with those cases.

■ We conclude, therefore, that subcontracts under the section 8(a) program may be awarded on a noncompetitive basis.

■ D. The plaintiffs also contend that in awarding the Homestead contract the SBA violated section 124.8–1(d)(3) of the applicable regulations, which provides that "procurements [under section 8(a)] will not be considered where . . . (3) . . . small business concerns are dependent in whole or in significant part on recurring Government contracts." 13 C.F.R. § 1248–1(d)(3). It is clear from the evidence presented to the district court, however, that the plaintiff who had previously been awarded the Homestead contract failed to perform the required services and abandoned the contract after nine and a half months. Thus, the SBA was not depriving the plaintiffs of a renewal of an existing contract by placing the Homestead contract under the section 8(a) program.

E. Finally, the plaintiffs contend that the SBA's section 8(a) program, by using the government's lending and contracting power to enhance All American's competitive position, violates due process. In effect, the plaintiffs argue that the section 8(a) program enabled All American to receive a premium price above that which would have prevailed under competitive bidding and that All American has since used this premium to submit low bids for private commercial contracts, causing the plaintiffs to lose some of their customers to All American.

■ It has long been recognized that the government, like private individuals and businesses, has the power "to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." Perkins v. Lukens Steel Co., 1939, 310 U.S. 113, 127, 60 S.Ct. 869, 876, 84 L.Ed. 1108. In exercising this power, of course, the government remains subject to the constitutional requirement of due process. But in the case at bar we cannot accept the plaintiffs' argument that the section 8(a) program is unconstitutional because the plaintiffs may be disadvantaged competitively. There is no constitutional duty to offer government procurement contracts for competitive bidding. The SBA has the statutory authority to assist small business concerns through private placement of contracts. We have already held that the SBA has not abused its discretion in adopting the section 8(a) program. The program may produce some inequalities among small business concerns as a class. But in the area of socio-economic legislation, the government's action must be upheld if it is rationally related to a proper government purpose. Dandridge v. Williams, 1970, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491; Walters v. St. Louis, 1954, 347 U.S. 231, 74 S.Ct. 505, 98 L.Ed. 660. We hold that it is.

## IV.

We now consider the district court's decision that the SBA's section 8(a) program is unconstitutional because "the primary criterion for eligibility is race, color, or ethnic origin" and that the "[p]laintiffs have been excluded from consideration because of their race." As we have stated, to have standing to litigate, a party must show that he has incurred or is in immediate danger of incurring some direct and personal injury resulting from a statutory or constitutional right designed to protect that par-

ty. Moose Lodge No. 107 v. Irvis, *supra;* Sierra Club v. Morton, *supra;* Laird v. Tatum, *supra*; Association of Data Processing Organization, Inc. v. Camp, *supra.* In this case the plaintiffs have failed to meet that requirement with respect to the issue of the SBA's alleged discrimination in administering the section 8(a) program. The plaintiffs never applied for participation in the section 8(a) program. Furthermore, they do not even contend that they are socially or economically disadvantaged and therefore eligible for participation in the program. Thus, whatever the outcome of the litigation, the plaintiffs will not be directly affected.

Most directly in point is Moose Lodge No. 107 v. Irvis, *supra.* There, the Supreme Court held that the plaintiff did not have standing to litigate the question involving the membership qualifications of the Moose Lodge because he did not attempt to become a member; he did have standing to litigate the issues concerning the Lodge's guest policies because he was refused service while a guest. In discussing the standing requirement, the Court stated, 407 U.S. at 92 S.Ct. at 1968, 32 L.Ed.2d at 634:

> Any injury to appellee from the conduct of Moose Lodge stemmed not from the Lodge's membership requirements, but from its policies with respect to the serving of guests of members. Appellee has standing to seek redress for injuries done to him, but may not seek redress for injuries done to others. [Citations omitted]. While this Court has held that in exceptional situations a concededly injured party may rely on the constitutional rights of a third party in obtaining relief, Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), in this case appellee was not injured by Moose Lodge's membership

policy since he never sought to become a member.

    It follows from *Moose Lodge* that the plaintiffs in the present case have no standing to litigate the issue of racial discrimination in the administration of the section 8(a) program because they did not even apply for participation in the program.

In Space Services of Georgia v. Laird, *supra,* the district court dismissed a similar challenge to the SBA's section 8(a) program on the ground that the plaintiff could "complain that there is discrimination in the administration of the program only if he had tried to become a member of the class eligible for the program." Again, in Fortec Constructors v. Kleppe, *supra,* the district court held that the plaintiff had no standing to raise the issue of racial discrimination because he had not applied for participation in the program. The court concluded that "[since] the plaintiffs have never sought to be eligible for the section 8(a) program, and never having had an 8(a) contract to gain, they cannot now allege that a contract was lost . . . . Solely on the basis of some generalized interest in the fair administration of a program, plaintiffs cannot attack the award as racially discriminatory."

In effect, the plaintiffs are asking this Court to resolve a question that is not now before us. We must decline the invitation. *See* United States v. Raines, 1960, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed. 2d 524. Otherwise, the grasp of our decree would exceed its proper reach. We therefore conclude that it was error for the district court to consider the issue of racial discrimination in the administration of the program.

The decision of the district court must be

Reversed.