Carl L. **BAKER**, Petitioner,

v.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**, Respondent.

No. 89–3430.

United States Court of Appeals, Federal Circuit.

Aug. 31, 1990.

**1450**

Louis J. Kozlakowski, Jr., Blum, Yumkas, Mailman, Gutman & Denick, P.A., of Baltimore, Md., argued for petitioner. With him on the brief was Edward J. Gutman.

Martha H. DeGraff, Attorney, Commercial Litigation Branch, Dept. of Justice, of Washington, D.C., argued for respondent. With her on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Stephen J. McHale, Asst. Director.

Before MAYER, Circuit Judge, COWEN, Senior Circuit Judge, and ALARCON, Circuit Judge.*

## OPINION

ALARCON, Circuit Judge.

Carl L. Baker appeals from the final decision of the Merit Systems Protection Board (the Board), which removed him from his position as a supervising computer specialist with the Department of Health and Human Services, Social Security Administration (the SSA), for accepting a gratuity and divulging confidential information to a potential subcontractor. 41 M.S.P.R. 363. We affirm.

## BACKGROUND

Prior to his removal, Baker had been employed by the SSA for twenty-nine years. During his last nine years of service, he advanced to a GM–15 Supervisory Computer Specialist and became the Deputy Director of the Office of Computer Processing Operations. In his capacity as Deputy Director, Baker was involved in the awarding of contracts to companies eligible to participate in the Small Business Administration's business development program pursuant to section 8(a) of the Small Business Act, 15 U.S.C. § 637(a) (the section 8(a) program).

The Small Business Administration's section 8(a) program is designed to promote the viability of socially and economically disadvantaged small business concerns by empowering the Small Business Administration (SBA) to enter into contracts with other federal agencies and "to arrange for the performance of such contracts by negotiating or otherwise letting subcontracts to small business concerns." *Baillie Trash Hauling, Inc. v. Kleppe*, 477 F.2d 696, 702 (5th Cir.1973), *cert. denied*, 415 U.S. 914, 94 S.Ct. 1410, 39 L.Ed.2d 468 (1974). In order to accomplish this goal, the SBA may dispense with competitive bidding. *Id.* at 708. In a noncompetitive contract award, the SBA awards the contract based on the technical capabilities of the company, not on price competition. 15 U.S.C. § 637(a)(2)(D), (a)(7) (1988). The SBA may also provide socially and economically disadvantaged business concerns with technical and managerial assistance

* Honorable Arthur L. Alarcon, United States Circuit Judge for the Ninth Circuit Court of Appeals, sitting by designation.

by advising and counseling on matters in connection with Government procurement and property disposal and on policies, principles and practices of good management, including but not limited to cost accounting, methods of financing, business insurance, accident control, wage incentives, computer security, and methods engineering, by cooperating and advising with voluntary, business, educational, and other nonprofit organizations, associations, and institutions and with other Federal and State agencies, by maintaining a clearinghouse for information concerning the management, financing, and operation of small-business enterprises, by disseminating such information, and by such other activities as are deemed appropriate by the Administration.

*Id.* § 637(b)(1)(A).

In 1987, the SBA delegated the selection of subcontractors and the negotiation of SSA procurement contracts to the SSA. The SSA maintained a list of companies that were eligible to participate in the section 8(a) program. The SSA also maintained information regarding the technical capabilities of each company.

At this time, Baker was one of the persons responsible for reviewing the technical information in the SSA's files and for selecting five companies to make presentations to the SSA technical review committee for an annual wage reporting technical support services contract (the AWR contract). Baker was also a member of the five-person technical review committee. This committee had the responsibility of evaluating the technical capabilities of each company and making a recommendation to the Small Business Administration for the award of the AWR contract. The five companies selected to make presentations for the AWR contract award were Washington Data Systems, Information Control Systems Corporation, American Information Systems, Kenrob & Associates, Inc., and Computer Dynamics, Inc.

In November 1987, after the five companies had been selected to appear before the technical review committee, but prior to the date of their presentations, Baker accepted an invitation to join Jack Wicklein, the marketing manager for Rehabilitation Group, Inc. (RGI), for lunch. Prior to resigning to work in the private sector, Wicklein had served as the SSA Associate Commissioner for Systems Operations. In that capacity, Wicklein was Baker's superior. Baker and Wicklein had developed a personal friendship that endured after Wicklein left government service. Baker was aware that Wicklein was then employed by RGI. Baker also knew that RGI was a subcontractor to one of the five companies that had been selected to appear before the technical review committee.

Several days before the luncheon, Wicklein asked Baker if Richard Quigg could attend. Notwithstanding his misgivings because he knew that Quigg was the president of RGI, Baker agreed.

On November 27, 1987, Baker met Quigg and Wicklein for lunch. Baker gave the following description of the lunch in his sworn affidavit:

> Eventually, Quigg asked me how the Annual Wage Report (AWR) contract was going. After I responded by saying that it was going along fine, Quigg asked me how I would rate the five corporations that were in the running for the contract. I told Quigg that at the present I would probably have to rate:
>
> Washington Data Systems # 1
> Kenrob and Associates # 2
> Information Control Systems # 3
> American Information Systems # 4
> Computer Dynamics # 5
>
> I did not think that my numerical rating of the corporations would present a problem to Quigg because I knew that RGI had teamed with Washington Data Systems on a previous contract. Also, I felt at that time that my appraisal of the corporations was reasonably accurate based on my knowledge[ ] of their abilities.
>
> I was surprised to hear Quigg say that he had a problem with Washington Data Systems being number one because RGI was teamed with Kenrob and Associates for the AWR contract. Quigg then

asked me how I could make number two (Kenrob and Associates) number one.

At that point, I reached to Jack Wicklein, touched him on the chest and asked, "Are you wired?"

"You can't ask me those questions!" Jack immediately excused himself and went to the men's room where he stayed for approximately 10 minutes. While Jack was away, I told Quigg in no uncertain terms how upset I was that he tried to compromise my integrity. However, when Jack returned, Quigg again asked me how I could make number two number one. I then said, "Are you sure you guys aren't wired?"

After saying that, I told Jack and Quigg that that was it and that I was leaving. I offered to pay the bill, but they said that they would take care of it.

After the companies' presentations to the technical review committee, the committee decided to recommend Washington Data Systems, Inc. for the AWR contract. During the week of December 21, 1987, more than three weeks after Baker's meeting with Quigg and Wicklein, the other companies were notified of the technical review committee's recommendation.

On December 24, 1987, Wicklein told Baker during a telephone conversation that Quigg was considering filing a lawsuit because Baker had expressed his preference for Washington Data Systems, Inc., *prior* to the presentations to the technical review committee. Four days later, Baker met with Bert Reid, Director of the Division of ADP and Telecommunications Contracts, and reported to him that he had had lunch with Wicklein and Quigg prior to the presentations. Thereafter, on May 17, 1988, the SSA canceled the AWR solicitation.

On July 18, 1988, Baker's employment with the SSA was terminated for accepting a gratuitous meal and for divulging confidential information to the representatives of a company teamed with another company involved in competing for an SSA contract. On November 1, 1988, the administrative law judge (the ALJ) sustained the charges against Baker. The ALJ ordered the SSA to cancel Baker's removal, how-

ever, and to demote him to a non-supervisory position.

Baker filed a petition for review of the ALJ's decision. The SSA filed a cross-petition challenging that portion of the order regarding the reduced penalty imposed by the ALJ. The Board denied Baker's petition pursuant to 5 C.F.R. § 1201.115. The SSA's petition was granted. The Board concluded that the removal penalty should not have been mitigated by the ALJ. Baker timely appealed.

## DISCUSSION

Baker presents the following contentions in his appeal:

1. The Department of Health and Human Services Standards of Conduct (the HHS Standards) do not apply to section 8(a) contracts.

2. The Board's decision is not supported by substantial evidence.

3. The ALJ erred in imposing pre-hearing sanctions.

4. The Board erred in failing to reverse the SSA's removal decision because the SSA committed harmful error in applying its oral reply procedure.

5. The sanction of removal has not been imposed on similarly situated SSA officials.

We address each of these arguments in turn.

I. *Applicability of the Department's Standards of Conduct*

45 C.F.R. § 73.735–307 sets forth the HHS Standard governing the use of official information. Section 73.735–307 provides in pertinent part:

(a) The public interest requires that certain information in the possession of the Government be kept confidential, and released only with general or specific authority under Department or operating component regulations. Such information may involve the national security or be private, personal, or business information which has been furnished to the Government in confidence. In addition, information in the possession of the

Government and not generally available may not be used for private gain. The following paragraphs set forth the rules to be followed by Department employees in handling information in official files or documents:

. . . .

(4) *Use of information for private gain.* Government employees are sometimes able to obtain information about some action the Government is about to take or some other matter which is not generally known. Information of this kind shall not be used by the employee to further his or her or someone else's private financial or other interests. Such a use of official information is clearly a violation of a public trust. Employees shall not, directly or indirectly, make use of, or permit others to make use of, for the purpose of furthering any private interest, official information not made available to the general public.

45 C.F.R. § 73.735–307 (1989).

 Baker contends that because of the exemption from competitive bidding accorded to disadvantaged business concerns and the requirement that they be provided with technical assistance pursuant to 15 U.S.C. § 637(b), the HHS Standards do not preclude a government officer in his position from disclosing information that would enable a potential subcontractor to obtain a government contract. He argues that such a disclosure promotes the goals of the section 8(a) program.

Baker misapprehends the scope of the HHS Standards and the design of the section 8(a) program. The HHS Standards apply to each officer or employee of the Department in order "[t]o assure that the business of the Department of Health and Human Services (HHS) is conducted effectively, objectively, and without improper influence or the appearance of improper influence." 45 C.F.R. § 73.735–101 (1989). The regulations prohibit *all* employees of the Department from permitting others to make use, for private interest, of "official information not made available to the general public." *Id.* § 73.735–307(a)(4). As an

employee of the Department, Baker was subject to this regulation.

The structure of the regulations governing the section 8(a) program reinforces this conclusion. The SSA, in conjunction with the SBA, may hold a limited technical competition "for consulting services, research, computer science and related services, research, development, test, evaluation, demonstration, and technical and professional services, where technical aspects, methodology, or approach are of primary importance rather than price." 48 C.F.R. § 319.870(a)(2) (1989). 48 C.F.R. § 319.870(c) sets forth the procedure for holding a limited technical competition:

(c) *Technical evaluation.* (1) When the concerns to be included in the limited technical competition have been determined by the contracting activity, in consultation with SBA, the contracting officer shall hold a technical competition among those concerns. Cost factors shall not be included in the technical proposals nor brought out in any manner during technical discussions of the proposals.

(2) When the limited technical competition is completed, a technical evaluation report shall be prepared and signed by the technical evaluators. The report shall indicate the ranking of the concerns, include a narrative evaluation specifying the strengths and weaknesses of each concern, and state any reservations or qualifications that might bear upon the selection of a source for negotiation and award. The technical evaluation report is required whether the limited technical competition was conducted on the basis of written technical proposals or oral technical discussions. The technical evaluation report shall be furnished [to] the contracting officer and maintained as a permanent record in the contract file.

(3) The contracting officer shall send a letter to the SBA naming the highest rated concern and indicating the concern appears to have the capability to perform the requirement. The letter shall request authority to negotiate with the concern nominated for award, and include

the title of the acquisition and the national buy number assigned by SBA. No other data need be furnished to SBA. Within ten (10) business days after receipt of the letter, the local SBA office will contact the contracting officer to arrange for contract negotiation. If a shorter response time is required, the contracting officer should notify SBA in the letter.

*Id.* § 319.870(c). Although the SSA is not required to conduct a technical competition among the participating concerns under these regulations, if such a limited competition is utilized, a technical evaluation is to be made and disclosed only *after* the limited technical competition. *Id.* § 319.870(c). The unsuccessful participating concerns are then counseled in order to strengthen future proposals. *Id.* § 319.870(f). This sequence of disclosure establishes that the rankings of the firms participating in the limited technical competition are "official information not made available to the general public" at all times *before* the limited technical competition.

The HHS Standards demand an even-handed administration of the section 8(a) program. The fact that disadvantaged firms are entitled to technical and managerial assistance does not justify leaking "official information" that further disadvantages other similarly situated competitors. Baker had no authority to give RGI such a competitive edge.

## II. *Sufficiency of the Evidence to Support the Removal Penalty*

Baker maintains that the Board's findings that he divulged confidential information to a potential subcontractor and that he accepted a gratuity from a potential subcontractor are not supported by substantial evidence.

Pursuant to 5 U.S.C. § 7703(c), the Board's decisions must be sustained unless found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or unsupported by substantial evidence. *Spezzaferro v. FAA*, 807 F.2d 169, 173 (Fed.Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Massa v. Department of Defense*, 815 F.2d 69, 72 (Fed. Cir.1987).

## A. *Confidential Information*

■ Baker first argues that the information he divulged was not confidential because his opinion concerning the relative technical capabilities of the companies being considered for the AWR contract was based on their past performance on SSA contracts.

Section 73.735–307(a)(4) of the HHS Standards states that government employees may not divulge information to which they are privy because of their government employment to others who may use it for private gain when that information is regarding "some action the Government is about to take or some other matter which is not generally known." 45 C.F.R. § 73.735–307(a)(4). The Board affirmed the ALJ's finding that Baker had divulged confidential government information in violation of section 73.735–307(4).

Baker testified that his duties included contract administration and procurement. He stated that he was one of the people "most essential" in the section 8(a) contract procurement process. Because of his significant role in the process, he was privy to confidential government information. Disclosure of this information, or any evaluations made therefrom, could directly affect the procurement, as well as compromise Baker's position.

Baker admitted giving the ranking information to Wicklein and Quigg. This information was "not made available to the general public." This disclosure provided RGI with an opportunity not available to other participants to better its chances of participating in the AWR contract. Wicklein and Quigg could have used the ranking information to change RGI's teaming. Thus, Baker's opinion of the ranking of the firms, by virtue of his access to information valuable to a potential subcontractor such as RGI, and his prominent position in the procurement process, violated the prohibition of disclosure of official information. We

therefore conclude that the Board's finding that Baker released information in violation of section 73.735–307(a) is supported by substantial evidence.

Baker next asserts that disclosure of the ranking information did not violate section 73.735–307(a) because the government may disclose the names of firms that have been selected to receive a solicitation to enable subcontractors to contact prospective prime contractors early in the procurement. 48 C.F.R. § 5.206(a)(1) (1989). 48 C.F.R. § 5.206(a)(1) provides, in pertinent part:

Contracting officers shall encourage prime contractors and subcontractors to use the [Commerce Business Daily] to publicize subcontracting opportunities stemming from their Government business. Subcontract information should be mailed directly to the [Commerce Business Daily] under the heading "Subcontracting Assistance Wanted," using the format in 5.207.

*Id.* This section does *not* authorize a government officer to divulge information at a private meeting with a potential subcontractor.

### B. *Gratuitous Lunch*

■ Baker next contends that the Board's finding that he accepted a gratuity from a potential subcontractor is not supported by substantial evidence. Relying on *Massa v. Department of Defense*, 815 F.2d 69 (Fed.Cir.1987), Baker asserts that he did not have actual or constructive knowledge that he was receiving something of value from a potential subcontractor. He argues that the evidence shows that the lunch was a social engagement between friends.

Section 73.735–501 of the HHS Standards provides, in pertinent part:

(a) Except as provided in 73.735–502 and 73.735–506, an employee shall not directly or indirectly solicit or accept anything of monetary value, including gifts, gratuities, favors, entertainment or loans from a person who the employee knows, or should know because of the nature of the employee's work:

(1) Has, or is seeking to obtain, contractual or other business or financial relations with the employee's principal operating component, or sub-unit thereof; or with a component of the Department with respect to which the employee has official duties;

\* \* \* \* \* \*

(3) Has interests that may be substantially affected by the performance or non-performance of the employee's official duties.

45 C.F.R. § 73.735–501 (1989). Section 73.-735–502(d) specifies that "[a]n employee may accept food ... only if the employee is properly in attendance and there is not a reasonable opportunity to pay." *Id.* § 73.735–502(d).

The Board adopted the ALJ's finding that Baker knew or should have known that he had accepted a gratuity when he left the restaurant without paying for his meal. The ALJ based her finding on testimony that Baker was aware of Quigg's and Wicklein's positions at RGI, that he had agreed to meet with them, that he discussed the AWR contract with them, that he told them that the firm with which they were paired was not the top prospect for the award of the contract, and that he left the luncheon knowing that Quigg or Wicklein would have to pay the bill. These facts can be reasonably interpreted to demonstrate Baker's actual or constructive knowledge that he "was receiving something of value *from a contractor,*" *Massa v. Department of Defense*, 815 F.2d at 72 (emphasis in original), rather than a personal friend. The Board's finding that Baker accepted a gratuitous lunch from a potential subcontractor is based on substantial evidence.

### III. *Reasonableness of the Penalty*

### A. *Sufficiency of the Evidence to Modify the ALJ's Penalty Mitigation*

Baker argues that the Board abused its discretion by reversing the ALJ's mitigation of the penalty of termination. The review by the Board of an agency action is denominated "an appeal" of agency action. 5 U.S.C. § 7701(a) (1988). Even though the employee is the initiating party, the agency

is required to establish its case to the Board by a preponderance of the evidence. *Id.* § 7701(c). Under this standard, the "appeal" requires a *de novo* determination of the facts. *Jackson v. Veterans Admin.*, 768 F.2d 1325, 1329 (Fed.Cir.1985). The Board initially delegates this duty to an administrative judge. The Board may adopt the administrative judge's decision or modify it. *Id.* at 1330; 5 C.F.R. § 1201.116(a)(5) (1989). The Board's decision to reverse the administrative judge's determination must be supported by substantial evidence. *Jackson v. Veterans Admin.*, 768 F.2d at 1330.

■ In this matter, the Board examined the evidence and concluded that the factors supporting mitigation of the penalty were outweighed by the factors supporting termination of Baker's employment. The Board found that Baker's conduct was "serious and intentional" and that it related directly to his duties and the agency's mission. The Board based these findings on the evidence in the record that Baker played a key role in the section 8(a) contracting process and was responsible for assigning the administration of contracts to subordinates. Substantial evidence in the record supports each of the Board's findings. The Board also found that Baker's conduct undermined the integrity of the SSA's contracting process and contributed to the cancellation of a multi-million dollar contract. The Board did not abuse its discretion by reversing the sanction imposed by the ALJ.

### B. *Reasonableness of the Removal Penalty*

■ Baker contends that the removal penalty was grossly disproportionate to his alleged misconduct. "It is a well-established rule of civil service law that the penalty for employee misconduct is left to the sound discretion of the agency." *Miguel v. Department of the Army*, 727 F.2d 1081, 1083 (Fed.Cir.1984). We will defer to the agency's choice of penalty unless it is "grossly disproportionate to the offense charged." *Id.*

■ We are persuaded that the penalty was not grossly disproportionate. Baker was in a supervisory position within the Department. As such, he was responsible for enforcing the HHS Standards against his subordinates. 45 C.F.R. § 73.735–201(b) (1989). Baker had access to information about the AWR procurement solely because of his key position within the Department. He abused the trust reposed in him by divulging his assessment of the firms' rankings. Baker's conduct gave a potential subcontractor an unfair opportunity to foreclose other participants from obtaining a government contract. As an employee with twenty-nine years' experience in government service, Baker should have been aware of the seriousness of his conduct in meeting with a potential subcontractor and responding to the subcontractor's questions concerning the competitive rankings. The government presented evidence that Baker's violation of trust contributed to the cancellation of a multi-million dollar procurement program that was intended to benefit disadvantaged small business concerns. Under these circumstances, the penalty of removal was not grossly disproportionate.

### IV. *Validity of the Evidentiary Sanctions Imposed by the ALJ*

On August 23, 1988, the ALJ issued an order setting deadlines for the submission of prehearing materials. On September 9, 1988, the ALJ issued an order postponing the date of Baker's hearing and setting a new deadline for the receipt of all evidence to be presented at the hearing, including a list of witnesses and a summary of their testimony. The order stated, in pertinent part:

At the request of the appellant, the submission date for prehearing material has been pushed back until October 1, 1988. All material and motions must be *received in this office* by that date. Nothing will be accepted after that day absent a showing that it is new and material evidence that could not be discovered prior to the established due date.

(Emphasis added). Baker failed to present his list of witnesses on the date established by the ALJ. The ALJ granted the Department's motion to strike those witnesses pursuant to 5 C.F.R. §§ 1201.41(11) and 1201.43. The ALJ permitted Baker to call Wicklein as a witness, but Wicklein refused to appear without a subpoena. Because the Board refused to issue a subpoena, however, Wicklein was unavailable to testify. Baker contends that the ALJ's order imposing sanctions was harmful procedural error, and that the Board erred in denying his petition for review without addressing this contention. He further argues that the Board abused its discretion by refusing to issue a subpoena to Wicklein.

The ALJ had the power to grant sanctions pursuant to 5 C.F.R. § 1201.43. 5 C.F.R. § 1201.41(11) (1990). When a party fails to comply with an order for the production of witnesses, an administrative law judge may "[s]trike any appropriate part of the pleadings or other submissions of the party failing to comply with such order." *Id.* § 1201.43(a)(4). Such sanctions may be imposed by an administrative law judge "as necessary to serve the ends of justice." *Id.* § 1201.43.

■■■ Sanctions relating to discovery and evidentiary issues fall within the sound discretion of the Board and its officials. *Curtin v. Office of Personnel Management*, 846 F.2d 1373, 1378 (Fed.Cir.1988); 5 C.F.R. § 1201.41(a), (b). "This court will not overturn the board on such matters unless an abuse of discretion is clear and is harmful." *Curtin v. Office of Personnel Management*, 846 F.2d at 1378. If an abuse of discretion did occur with respect to the ALJ's evidentiary rulings, Baker must prove harmful error "that could have affected the outcome of the case." *Id.* at 1379.

■■ The ALJ acted within her sound discretion by striking Baker's untimely submission of his witness list. The deadline for submitting this material had been postponed for two weeks at Baker's request. The order stated unequivocally that October 1, 1988 was the deadline for *receipt* of Baker's witness list in the ALJ's office.

Baker failed to mail his witness list by that date. Baker also failed to make a showing that his witness list contained new and material evidence that could not have been discovered prior to October 1, 1988. Because Baker failed to comply with the ALJ's order, the imposition of sanctions pursuant to 5 C.F.R. § 1201.43(a) was not an abuse of discretion.

■■ Baker contends that the Board erred by refusing to issue a subpoena to Wicklein. The ALJ's August 23, 1988 order directed Baker to file a motion for a subpoena of all non-federal witnesses by September 16, 1988, pursuant to 5 C.F.R. § 1201.81(b). Baker has failed to point to any evidence in the record that demonstrates that he filed a motion for a subpoena of Wicklein. The Board did not err in refusing to issue the subpoena.

The Board did not specifically address Baker's contention that the ALJ committed harmful procedural error by striking the witness list. The Board concluded, instead, that Baker had failed to establish that new and material evidence was available that could not have been presented at the hearing or that the ALJ's decision was based on an erroneous interpretation of a statute or regulation. 5 C.F.R. § 1201.115 (1990). Baker argues that the Board abused its discretion by failing to explain its decision to deny his petition for review. Baker relies on *Spezzaferro v. FAA*, 807 F.2d 169 (Fed.Cir.1986), for the proposition that the Board may not conclude that error is not harmful without articulating its reasoning.

■■ Baker was required to demonstrate that the ALJ abused her discretion before the Board was required to consider any alleged harm resulting from the challenged order. *See Curtin v. Office of Personnel Management*, 846 F.2d at 1379 ("If an abuse of discretion did occur with respect to the discovery and evidentiary rulings, in order for petitioner to prevail on these issues he must prove that the error caused substantial harm or prejudice to his rights which could have affected the outcome of the case."). Baker has been unable to show that the ALJ's imposition of

sanctions was an abuse of discretion. Accordingly, the Board did not err in failing to explain its decision.

### V. *Oral Reply Procedure*

Baker argues that the SSA's oral reply procedure was improperly applied because the reply official did not have the authority to make or recommend a final decision in this matter. Baker asserts that this alleged procedural error was prejudicial. Pursuant to 5 U.S.C. § 7513, a government employee against whom a personnel action is proposed is entitled to:

(1) at least 30 days' advance written notice, unless there is reasonable cause to believe the employee has committed a crime for which a sentence of imprisonment may be imposed, stating the specific reasons for the proposed action;

(2) a reasonable time, but not less than 7 days, to furnish affidavits and other documentary evidence in support of the answer;

(3) to be represented by an attorney or other representative; and

(4) a written decision and the specific reasons therefor at the earliest practicable date.

5 U.S.C. § 7513 (1988). The Department must "designate an official to hear the employee's oral answer who has authority either to make or recommend a final decision on the proposed adverse action." 5 C.F.R. § 752.404(c)(2) (1990).

The reply official heard Baker's arguments and presented a written summary of the hearing to the deciding official. Baker contends that this procedure resulted in harmful error. The ALJ found that the reply official had the authority to make a recommendation to the deciding official.

■■■ An employee who claims that the oral reply was flawed must establish that the authority of the oral reply officer was erroneously restricted and that this error was harmful. *Schultz v. Department of Transp.*, 773 F.2d 296, 299 (Fed. Cir.1985). Presentation of a summary of the employee's arguments and a recommendation by the reply official is sufficient to satisfy the oral reply requirements.

*Monroe v. Department of the Treasury*, 770 F.2d 1044, 1046–47 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1045, 106 S.Ct. 1260, 89 L.Ed.2d 570 (1986).

■■■ Several factors support the ALJ's conclusion that the oral reply procedure was not flawed. First, the deciding officer testified that the reply officer made a recommendation to settle the case. Second, the reply officer participated actively in the hearing, fulfilling Baker's entitlement to "a general give and take discussion of the case." *Ricucci v. United States*, 192 Ct.Cl. 1, 3–4, 425 F.2d 1252, 1254–55 (1970). Third, the reply officer was a line officer and therefore could be expected to make a recommendation that would "have weight" with the deciding officer. *Id.*, 192 Ct.Cl. at 4, 425 F.2d at 1255. Baker has failed to demonstrate that the reply officer did not have the authority to make a recommendation to the deciding official.

### VI. *Disparate Treatment*

■■■ Baker maintains that he received disparate treatment because other SSA officials named in a General Accounting Office report as having accepted gratuities from subcontractors were not removed from their positions as he had been. The ALJ found this argument unpersuasive because Baker did not establish that he and the employees mentioned in the report were "similarly situated." The ALJ found that the employees named in the General Accounting Office report did not improperly disclose government information.

In *Facer v. Department of the Air Force*, 836 F.2d 535 (Fed.Cir.1988), we held that a person does not have a legally protected interest in having a misconduct penalty similar to that imposed on another. *Id.* at 539. An exception applies only if employees are *knowingly* treated differently. *Id.* Baker does not allege that the agency knowingly treated him differently. Therefore, the Board did not err in denying Baker's petition on the ground that he did not prove disparate treatment.

## CONCLUSION

The Board's decision removing Baker from his position at the SSA for divulging confidential information to a potential subcontractor and for accepting a gratuity from a potential subcontractor is AFFIRMED.

AFFIRMED