Dear Mr. Brennan:
During a recent legislative audit of the Department of Business and Economic Development ("the Department" or "DBED"), the Legislative Auditor questioned whether a particular business qualified for a loan guarantee program administered by the Maryland Small Business Development Financing Authority ("the Authority" or "MSBDFA"). That program is designed to assist businesses whose owners are "socially or economically disadvantaged." At the behest of the Auditor, you have requested our opinion on the meaning of the phrase "economically disadvantaged" in this context.
The statutory provision under which MSBDFA granted the guarantee provides that an individual who owns a small business is "economically disadvantaged" if the business is unable to obtain adequate financing on reasonable terms through normal channels because the owner has an economic impediment beyond his or her control. For the reasons detailed below, it is our opinion that the owner of the business must suffer from a specific and identifiable impediment beyond the owner's control and independent of race, ethnicity, gender, or physical disability — which are covered by other sections of the statute — that prevents the business from competing on a level playing field with other businesses in the same industry. The Department has authority to identify by regulation the criteria under which a determination of economic disadvantage is made. Such criteria could include examples of impediments that are beyond the control of an individual, specific measures used by the Authority to assess "disadvantage," such as presumptive caps on the net worth and incomes of individual owners, identification of distressed geographic areas of the State, and other objective standards. When applying these criteria, the Authority should articulate the basis for its determination.
 I Background
A. MSBDFA Loan Guarantees
 1. MSBDFA
In 1978, the General Assembly created the Maryland Small Business Development Financing Authority to address inequities in the availability of business capital. Chapter 877, Laws of Maryland 1978, now codifiedat Annotated Code of Maryland, Article 83A, § 5-1001 et seq. The Authority, now a unit of DBED, consists of 9 members: 7 members appointed by the Governor, the Secretary of Business and Economic Development, and either the State Treasurer or the State Comptroller, as designated by the Governor. Article 83A, §§ 5-1003, 5-1004. Pursuant to statute, the Authority is staffed by a private contractor. Article 83A, §§ 5-1006, 5-1009.
In establishing and refining programs administered by MSBDFA during the past two decades, the Legislature has found that "socially or economically disadvantaged persons" frequently lack the working capital or long-term financing necessary to obtain and perform government contracts and to sustain their businesses. Article 83A, § 5-1002(a).[1] The Legislature has identified the purposes of MSBDFA as follows:
 (1) To assist socially or economically disadvantaged persons to obtain working capital that is adequate to begin, continue, and complete projects, the majority of funding for which is provided by government entities or utilities;
 (2) To encourage socially or economically disadvantaged persons to seek government and other contracts; and
 (3) To encourage financial institutions to make loans to these persons.
Article 83A, § 5-1002(b).
To carry out these purposes, the Legislature has created several special funds and has directed MSBDFA to use those funds to offer financial assistance to businesses owned and operated by "socially or economically disadvantaged persons." In one program, the Authority draws upon the Small Business Development Contract Financing Fund, also known as the "Contract Financing Fund," to assist such businesses with the performance of contracts funded by a government entity or a regulated utility. Article 83A, § 5-1001(f); § 5-1013 through § 5-1016; § 5-1021 through § 5-1027. Under another program, the Authority uses the Small Business Development Guaranty Fund, also known as the "Guaranty Fund," to provide long term financial assistance, unrelated to the performance of a specific contract. Article 83A, § 5-1001(i); § 5-1017 through § 5-1018; § 5-1028 through § 5-1031. Finally, the Authority may provide equity participation financing and related services for the acquisition and development of franchises and technology-based businesses by socially and economically disadvantaged persons.[2] Article 83A, § 5-1041 through § 5-1047.
MSBDFA has broad powers to carry out its functions, including the authority to adopt regulations. Article 83A, § 5-1010(10). In addition, the Secretary of Business and Economic Development is authorized to adopt regulations governing MSBDFA programs. Article 83A, § 2-105(b).
 2. Loan Guarantees
The audit finding that prompted your request related to eligibility for loan guarantees. MSBDFA may guarantee a loan, in an amount up to $500,000, to be used for working capital or equipment to perform a government-funded contract. Article 83A, § 5-1022(a). In addition, unrelated to the performance of a particular contract, MSBDFA may guarantee a long term loan, in an amount between $5,000 and $600,000, made by a financial institution to a qualified applicant; it may also subsidize the interest on such a loan. Article 83A, §§ 5-1028, 5-1029(a)(2). The guaranteed loan may be used for working capital, the acquisition and installation of equipment, or the acquisition or improvement of real property. Article 83A, § 5-1029(a)(3). As part of an application for a long-term loan guarantee, the financial institution that makes the loan must submit detailed information about the purpose of the loan, the collateral, the loan documents, the inability of the borrower[3] to obtain financing through normal lending channels, and the borrower's qualifications for the MSBDFA program. Article 83A, § 5-1030(b).
To qualify for a MSBDFA loan guarantee, a borrower must satisfy certain conditions. See Article 83A, §§ 5-1025 (setting forth criteria for contract financing program); 5-1029(a)(1) (incorporating by reference the criteria set forth in § 5-1025 for the long term guarantee program). For example, the borrower must have applied for, and been denied, a loan by a financial institution. Article 83A, § 5-1025(d). In addition, individual borrowers must satisfy certain personal criteria. If the borrower is not a sole proprietorship, owners of at least 70 percent of the business must satisfy these criteria. Article 83A, § 5-1025(c). In particular, an individual must be of good moral character, have a reputation for financial responsibility, and reside or have a principal place of business in Maryland. Article 83A, § 5-025(b)(1)-(3). An individual must also be able to relate the inability to obtain financing to social or economic disadvantage. Article 83A, § 5-1025(b)(4).
Regulations adopted by the Secretary of Business and Economic Development reiterate the statutory qualifications. See COMAR24.05.07.04, 24.05.08.04. The regulations also require a showing that the disadvantaged applicant, or the owners of the applicant who qualify as "socially or economically disadvantaged" actually control, as well as own, at least 70 per cent of the enterprise for which assistance is sought. See COMAR 24.05.08.04A(5).
We understand that, in considering a request for financial assistance, the Authority's administrative practice is to look at the personal finances of the individuals who own or control the business venture, the financial condition of the business, and the efforts made to secure private financing for the venture.
 3. Social or Economic Disadvantage
The MSBDFA statute requires a showing that the beneficiary of a loan guarantee "is unable to obtain adequate business financing through normal lending channels" because the individual owner(s) of the business fall within at least one of three categories of social or economic disadvantage listed in the statute.[4] First, an individual may be socially or economically disadvantaged because of membership in a group that historically has been deprived of access to financial resources because of "race, color, creed, sex, religion, or national origin." Article 83A, § 5-1025(b)(4)(i). Neither the statute nor the regulations identify the particular racial, ethnic, or religious groups that are deemed "historically deprived of access to normal economic or financial resources" for purposes of the first category.
Second, an individual may be socially or economically disadvantaged as a result of "an identifiable physical handicap that severely limits the ability of the applicant to obtain financial assistance," but does not limit the ability of the applicant to conduct business. Article 83A, § 5-1025(b)(4)(ii).
Finally, an individual may qualify as socially or economically disadvantaged if he or she has another social or economic impediment beyond the control of the individual, "such as lack of formal education or financial capacity or geographical or regional distress." Article 83A, § 5-1025(b)(4)(iii). Neither the statute nor the regulations contain an exhaustive list of what constitutes such a social or economic impediment.
The transaction that resulted in your inquiry concerns a borrower whose principal owner was considered "economically disadvantaged" under the third category.[5]
B. 1996 Loan Guarantee
In December 1996, MSBDFA approved a loan guarantee in the amount of $400,000 under the Guaranty Fund program. Although the language of the resolution authorizing the transaction is not entirely clear, the Authority apparently made a "finding" that the borrower qualified for the program on the basis that its principal owner was "socially or economically disadvantaged" because the owner satisfied either the second (physical handicap) or the third (social or economic impediment) category of the statute, repeating the statutory language virtually verbatim. The transaction file, however, contains no indication that the individual owner was physically handicapped. Rather, it identifies "lack of collateral" as the economic impediment that qualified the borrower under the third category of the statute. Personal financial statements in the file, which had been submitted by the owner to the Authority, indicated that the individual owner had a net worth of more than $6 million and an annual income of approximately $600,000.
Thus, despite language in the Authority's resolution referring to physical handicap, the Authority determined that the owner of the business was "unable to obtain adequate business financing on reasonable terms through normal lending channels because the applicant . . . has [a] social or economic impediment that is beyond the control of the applicant, such as lack of . . . financial capacity. . . ." Based on this finding, and determinations that the business venture was viable and that the borrower was capable of repaying the debt, the Authority approved a partial loan guarantee of $400,000, to enable the borrower to obtain private sector financing in the amount of $1.25 million.
C. Legislative Audit
During its most recent biennial audit of DBED, the Office of Legislative Audits found that MSBDFA had provided a loan guarantee "to an applicant that appears ineligible," citing the December 1996 transaction. Audit Report, Department of Business and Economic Development (December 1998), p. 11. The auditors questioned whether the Authority had applied the criterion of economic disadvantage to the business venture itself, rather than to the principal individual owner of the venture, and thus failed to take adequate account of that individual's large personal net worth and annual income. The Audit Report stated:
 [T]he eligibility criteria established by Article 83A, Section 5-1025 of the Annotated Code of Maryland, apply to the applicant and not to the business venture being undertaken. . . . In our opinion, the Department has broadened the criteria for qualifying under the economically disadvantaged provision of the law to the extent that many new business ventures, irrespective of the owner's personal financial situation, could potentially qualify for assistance from the Fund.
Audit Report, p. 12. The Legislative Auditor recommended that DBED obtain an opinion of the Attorney General to clarify the statutory eligibility requirements for MSBDFA's loan guarantee programs, specifically the "economically disadvantaged" criterion. Id.
DBED responded that it had not adopted the position that the personal financial situation of the owner of a business is irrelevant to eligibility. Audit Report, Appendix A (DBED Response), p. 8. It conceded that the personal financial statement of the principal owner involved in the transaction indicated a "net worth" exceeding $6 million, but contended that "tangible net worth" was a more appropriate measure for credit purposes and that the principal's tangible net worth was less than $1 million during the relevant period.[6] DBED stated that the transaction had been assessed in accordance with its normal procedures:
 The Relationship Summary, a document which accompanies each credit presentation, correctly identified the [tangible net worth] as being less than $1 million . . . . . Additionally, the credit analysis prepared for this transaction likewise identified the collateral shortfall and the mitigating factor that the guarantors had historical cash flows which could [not] cover the debt sufficiently if the borrower experienced payment problems. DBED is adamant that it correctly identified the risks, and appropriately evaluated the credit, collateral, and guarantee positions and structured the transaction in accordance with the DBED Desktop Policy and Procedures Manual.
Audit Report, Appendix A, p. 8.[7] DBED also noted that the Small Business Administration ("SBA") had provided a $750,000 guarantee for the same transaction, under a program requiring that the borrower be unable to secure funding through "normal lending channels" (i.e., without substantial guarantees of the federal government, the State, and personal and corporate guarantors.). Id.[8]
DBED agreed that the statutory eligibility requirements were vague and proposed to supplement the agency's regulations concerning eligibility criteria. The Department also requested this opinion.
 II Discussion
The question raised by the Legislative Auditor concerns the basis for determining whether the owner of a business that seeks assistance under the MSBDFA statute is "socially or economically disadvantaged" — in particular, whether that person has a "social or economic impediment that is beyond the personal control of the applicant." Article 83A, § 5-1025(b)(4)(iii). The statute provides several examples of a social or economic impediment — lack of formal education, lack of "financial capacity," and geographical or regional economic distress — but does not specifically define the phrase. These examples appear to be illustrations, and not an exhaustive list of the types of economic impediment that the statute is designed to counteract. Cf.
Annotated Code of Maryland, Article 1, § 30 (list following term "including" normally construed as illustrative).
A review of the origins of the MSBDFA statute and of related federal laws provides some insight as to the entrepreneurs targeted by the Legislature in the third category of the MSBDFA statute.
A. Legislative History of MSBDFA Statute
Although the MSBDFA statute has been recodified twice and amended frequently by the Legislature, the eligibility criteria have remained essentially constant. When the statute was first enacted in 1978, as part of Article 41 of the Annotated Code of Maryland, a prerequisite to eligibility for the program was "social or economic disadvantage," defined in language very similar to that of the current statute. See
Annotated Code of Maryland, Article 41, § 266HH-2 (1978).[9] That definition was the product of consideration by the Legislature during two sessions.
Legislation authorizing loan guarantees to small disadvantaged businesses was first proposed in 1977 as a departmental bill by the Department of Economic and Community Development ("DECD"), a predecessor agency of DBED.[10] See Senate Bill 914 (1977). In a memorandum submitted to the legislative committees, DECD explained that small firms assisted by its Office of Minority Business Enterprise often were unable to perform contracts that they had won because of an inability to obtain financing for working capital. Memorandum of Department of Economic and Community Development to House Economic Matters Committee (April 4, 1977).
As originally drafted, the 1977 bill related "social or economic disadvantage" solely to physical handicap or membership in a minority group that "has been historically deprived of access to normal economic or financial resources." However, that definition was criticized as "too limited" in that it did not include many individuals in depressed economic regions of the State.[11] As a result, the definition was amended to include "other social or economic considerations beyond [the individual's] personal control, such as formal education, financial capacity, geographical, or regional economic distress." The bill passed the Senate, but failed in the House.
The next year, a similar departmental bill was submitted by DECD. House Bill 438 (1978). The 1978 bill included a broader definition of social or economic disadvantage similar to the amended version of the 1977 bill.[12] Summarizing the bill in a memorandum to the legislative committees, DECD elaborated on the definition of economic or social disadvantage as follows:
 Eligible applicants under the bill are defined as business enterprises owned by at least 70% of socially or economically deprived individuals. These can be members of minority groups which historically have suffered discrimination, physically handicapped persons, or persons otherwise impeded by social or economic considerations beyond their personal control. This definition is similar to the Minority Enterprise Small Business Investment Corporation (MESBIC) language under the SBA statute.
See Memorandum to Senate Economic Affairs Committee from the Department of Economic and Community Development concerning House Bill 438 (1978). It thus appears that the drafters of the MSBDFA program intended to incorporate a concept already used in federal legislation concerning minority small businesses.
B. Federal Precursors
 1. SBIC Act
The reference in the DECD memorandum to the "SBA statute" was apparently to the Small Business Investment Act of 1958 ("SBIC Act"), nowcodified at 15 U.S.C. § 661-62, 671, 681-87m, 692-94c, and 695-97c. The SBIC Act authorized the federal Small Business Administration ("SBA") to charter privately-operated small business investment companies (SBICs) and to assist in the initial capitalization of the SBICs. In turn, the SBICs were authorized to make loans to, and equity investments (by means of convertible debentures) in, small businesses.
As originally enacted in 1958, the SBIC Act did not make reference to disadvantaged businesses. In 1969, the SBA began to license special SBICs — sometimes referred to as minority enterprise small business investment companies or "MESBICs" — to render financial and management assistance "solely to members of minority races and to those persons who are socially or economically disadvantaged." See House Report No. 92-1428, 1972 U.S. Code Cong. Admin. News 4929, 4930.
As part of the Small Business Investment Act Amendments of 1972, Congress codified that practice by adding § 301(d) to the SBIC Act,codified as 15 U.S.C. § 681(d). In doing so, the House committee that considered the legislation recommended elimination of the term "MESBIC," since that term implied that only members of minority groups were eligible for assistance, whereas the program was more broadly targeted at "those who are hampered in achieving full citizenship in our economic system by virtue of their social or economic disadvantages." House Report 92-1428, supra, at p. 4931. Other portions of that report indicated that the committee contemplated that a determination of social or economic disadvantage would be made "without regard to race" and that those eligible for assistance would include "Vietnam era veterans." Id.
at p. 4933. However, the report did not suggest any more specific definition of the eligibility criteria.
Thus, in 1978, when the General Assembly was considering the MSBDFA bill, the SBIC Act authorized the SBA to license special SBICS, still often labeled "MESBICs," to "facilitat[e] ownership in [small business] concerns by persons whose participation in the free enterprise system is hampered because of social or economic disadvantages. . ."15 U.S.C. § 681(d) (1978) (emphasis added). While that SBIC Act did not define "social or economic disadvantage," Congress apparently contemplated that the term would not be limited to specific racial or ethnic groups.
 2. Section 8(a) Program
In 1978, SBA also administered another program designed to assist socially and economically disadvantaged individuals under the authority of § 8(a) of the Small Business Act ("SBA Act")[13],15 U.S.C. § 637(a). Although the SBA Act itself did not explicitly refer to disadvantaged persons at that time, the SBA had promulgated regulations creating a "section 8(a) program." The express purpose of that program was "to assist small business concerns owned by disadvantaged persons to become self-sufficient, viable businesses . . ." by obtaining federal government contracts. 13 C.F.R. § 124.8-1(b) (1970). The SBA limited eligibility for the program to small businesses owned by "socially or economically disadvantaged persons." 13 C.F.R. § 124.8-1(c) (1970). The regulations did not explicitly define that phrase, although they noted that "[t]his category often includes, but is not restricted to, Black Americans, American Indians, Spanish Americans, Oriental Americans, Eskimos, and Aleuts." Id. See Ray Baillie Trash Hauling,Inc. v. Kleppe, 477 F.2d 696 (5th Cir. 1973) (describing 1970 regulations creating "section 8(a) program" and upholding them against a challenge based on alleged lack of statutory authorization).
C. Subsequent Federal Developments
After the passage of 1978 Maryland legislation, federal elaboration of the phrase "socially and economically disadvantaged" took place largely in the context of the SBA Act. The SBA issued regulations interpreting the SBIC Act that defined a "disadvantaged business" as one that was at least 50% owned by a person "whose participation in the free enterprise system is hampered because of social or economic disadvantages," but, again, social or economic disadvantage was not itself defined. See13 C.F.R. § 107.50 ("disadvantaged business"). However, Congress ultimately repealed the "MESBIC" portion of the SBIC Act in 1996. See
1996 Omnibus Appropriations Act, Pub.L. 104-208, Division D, Title II, § 208(b)(3), 110 Stat. 3009-742.
With respect to the section 8(a) program, Congress amended the SBA Act in late 1978 to provide explicit statutory authorization for that program. Pub.L. 95-507, 92 Stat. 1757 (1978), codified in15 U.S.C. § 637(a), (d). In ratifying the program undertaken by the SBA administratively, Congress added definitions of "socially and economically disadvantaged small business concern," "socially disadvantaged individual," and "economically disadvantaged individual" to the SBA Act. See 15 U.S.C. § 637(a)(4)-(6). A key distinction between the federal section 8(a) program and the MSBDFA program is that eligibility under the federal statute depends on a showing that the individual is both socially and economically disadvantaged, while the Maryland statute requires only that the individual be either socially or
economically disadvantaged.
Although these definitions were added to the SBA Act after the Maryland General Assembly had enacted the MSBDFA statute, they cover the same concepts as the MESBIC definition referenced by the drafters of the MSBDFA statute. The SBA Act defines an "economically disadvantaged" individual as a socially disadvantaged individual[14] "whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged . . . ."15 U.S.C. § 637(a)(4)(A). The statute states that, to assess economic disadvantage, the SBA "shall consider, but not be limited to, the assets and net worth of such socially disadvantaged individual." Id.
In its regulations governing the section 8(a) program,[15] the SBA has indicated that it will examine various factors relating to the financial condition of a person claiming to be disadvantaged, "including personal income for the past two years (including bonuses and the value of company stock given in lieu of cash), personal net worth, and the fair market value of all assets, whether encumbered or not."13 C.F.R. § 124.104(c). The SBA then compares the financial condition of the applicant business to financial profiles (e.g., total assets, net sales, pre-tax profit, sales/working capital ratio, and net worth) of other small businesses in the same industry to evaluate the individual's access to credit and capital. Id.
In addition to requiring a comparison with other businesses in the same industry, the SBA regulations set a ceiling on the personal income and wealth of entrepreneurs eligible for the section 8(a) program. In particular, an individual with a net worth exceeding $250,000 is not eligible to enter the program; an individual who has participated in the program loses eligibility once net worth exceeds $750,000.13 C.F.R. § 124.104(c)(2). The regulations thus recognize that an individual's net worth may increase as a result of participation in the program. In computing net worth the SBA excludes the individual's equity in the business venture for which assistance is sought and in a personal residence.Id.; see also 15 U.S.C. § 637
(a)(6)(E).
D. Summary
The MSBDFA statute does not offer a comprehensive definition of the third category of "socially or economically disadvantaged" individuals — i.e., those who suffer from a "social or economic impediment." The Department's suggestion, in its response to the audit, that it elaborate on the application of that category in its regulations is appropriate and desirable. Some basic guidelines are evident from the examples provided in the statute, its legislative history, and the approach taken by the SBA in administering a similar program.
First, this category encompasses persons who are at a competitive disadvantage in the market place for a variety of reasons other than race, color, creed, sex, religion, national origin, or physical handicap (which are covered by the first two categories of the statute). This category was apparently added to the MSBDFA statute in an effort to level the playing field for anyone who has to overcome other difficulties beyond his or her control to compete in the market place. Although the concept was imported from federal small business legislation, the legislative history underlying the federal statutes prior to 1978 offers little insight, other than to confirm that the phrase is not restricted to obstacles based on race and ethnicity alone.
Second, the terms "disadvantaged" and "impediment" imply a comparison — i.e., that the "disadvantaged" person is not able to compete with otherwise similarly situated persons because of the impediment. Although the difficulty of measuring "disadvantage" has sometimes been characterized as "insurmountable,"[16] some factors are susceptible of assessment. The statute itself suggests certain measures of disadvantage: educational opportunity, financial capacity, geographic residence. To the extent that the Authority is able to identify a benchmark against which to gauge "disadvantage," it may establish some objective standards. For example, the agency could, by regulation, identify geographic areas of the State that are economically depressed. Applicants who hail from those areas, and who intend to develop businesses in those areas, may have suffered the type of economic impediment envisioned by the Legislature.[17]
Similarly, in expanding on one of the examples supplied in the statute — "lack of financial capacity" — the Authority could set a presumptive ceiling on readily ascertainable measures of individual financial capacity, much like the SBA has done in its regulations under the section 8(a) program.[18] The MSBDFA program, by its nature, is intended to benefit small businesses, and the statute sets specific limits on the amounts of loan guarantees to individual enterprises.[19]
Presumably, there is a level of wealth or income at which any entrepreneur, even an otherwise disadvantaged one, would have the capital and credit necessary to own and operate a small business. Like the SBA, the Authority could specify a level of annual income, perhaps as sustained over some period of time, and net worth, however appropriately defined, that an individual could enjoy and still be considered to suffer an economic impediment. The regulations could allow for exceptions to the presumptive caps on net worth and income for those seeking entry to a particularly capital-intensive industry. In our opinion, the establishment of appropriate ceilings is a matter within the expertise of the agency and the ceilings set by the Department need not be equivalent to those set by the SBA.
Third, the impediment must be "beyond the control" of the individual. An economic impediment that is beyond the control of the individual is presumably one unaffected by the individual's efforts to earn money or gain profits. The MSBDFA statute is not an insurance program for poor business judgment. For example, the heir to a family fortune whose ill-timed bet on e-commerce stocks leaves him with little income and no net worth would not qualify as economically disadvantaged. Thus, the agency's analysis must go beyond a rote reliance on numerical measures of wealth and income.[20]
Finally, it seems clear that mere inability to obtain a loan without a State guarantee is not by itself an impediment that renders one "disadvantaged." An unsuccessful attempt to obtain a loan is a separate requirement of the statute. See Article 83A, § 5-1025(d). The statutory condition that the individual entrepreneur be "disadvantaged" would be redundant if it could be satisfied simply by failure to obtain a loan. For example, a "lack of collateral" may justify the denial of a loan to a business. Whether that condition renders the owner "economically disadvantaged" requires further inquiry into the reason why the owner lacks the necessary collateral.
The question that you have posed at the request of the Legislative Auditor does not require that we resolve the eligibility of the applicant in the particular transaction highlighted in the Audit Report. However, that transaction illustrates the need for explication and documentation of the Authority's finding that an individual is disadvantaged. While it seems unlikely that an individual with a recent annual income of $600,000 and a large net worth could qualify as "economically disadvantaged," there may be extraordinary circumstances in a particular context that would support such a determination. In our opinion, the Authority must clearly articulate the basis for its finding that makes its analysis transparent. In the transaction questioned by the Legislative Auditor, it is not evident from the resolution of the Authority approving this transaction how it made that determination — or even whether it was acting under the third category of the statute. Nor does the underlying transaction file detail the analysis made by the staff as to economic disadvantage beyond citing "lack of collateral."
 III Conclusion
The MSBDFA statute expresses an intent to provide financial assistance for business owners who cannot reasonably obtain the type of financing they seek due to social or economic impediments beyond their control. In our opinion, an owner of a business is "economically disadvantaged" within the meaning of the third category of the statute if the applicant can demonstrate, to the satisfaction of the Authority, that the business is not able to compete on a level playing field because the individual entrepreneur suffers a specific and identifiable impediment that is beyond his or her control. This determination is to be made without regard to the race, ethnicity, gender, or physical disability of the individual. The transaction documents should identify the impediment, and the Authority should specify the basis for its finding that an individual is disadvantaged, beyond simply quoting the language of the statute.
We recommend that the Department adopt regulations that establish criteria for determining economic disadvantage. Those criteria could include examples of impediments that are beyond the control of an individual, specific measures used by the Authority to assess disadvantage (such as presumptive caps on the net worth and incomes of individual owners), identification of distressed geographic areas of the State, and other objective standards.
 Very truly yours, J. Joseph Curran, Jr. Attorney General
 Laila Atallah Assistant Attorney General
 Robert N. McDonald Chief Counsel Opinions and Advice
[1] The statute currently states the following findings:
 (1) The inability of socially or economically disadvantaged persons to obtain working capital is a major limitation on their opportunity to win and perform government and other contracts;
 (2) In many instances on record, a socially or economically disadvantaged person has been awarded a government or other contract, but has lacked the working capital to post a performance bond, buy supplies needed to begin the work, or pay employees and therefore, has been unable to accept the contract;
 (3) Certain persons are unable to obtain government and other contracts for reasons other than the cost to the owner or the ability of the person to perform the contract work competently;
 (4) In many instances on record, socially or economically disadvantaged persons lack adequate capital to sustain and expand their businesses and to hire and train employees;
 (5) High risk, problem, or uncollectible loans are not in the interest of a financial institution, and therefore, financial institutions generally are reluctant to lend money to socially or economically disadvantaged persons with insufficient records of performance;
 (6) The inability of businesses owned by socially or economically disadvantaged persons to obtain long-term financing is a major limitation upon their opportunity to survive and expand; and
 (7) It is in the interest of the public welfare and purpose to promote the viability and expansion of businesses owned by economically or socially disadvantaged persons, to retain or increase the employment of economically or socially disadvantaged persons and to provide a larger taxable base for the economy of this State.
Article 83A, § 5-1002(a).
[2] The Authority also provides other assistance to small businesses, regardless of whether the business is owned by a socially or economically disadvantaged person. Under the Small Business Surety Bond Program, it may provide or guarantee surety bonds in connection with government contracts performed by small businesses, if the business is unable to obtain a bond on reasonable terms through normal channels. Article 83A, § 5-1032 through § 5-1040.
[3] The statute refers to the financial institution as the entity making application for the loan guarantee. Article 83A, § 5-1030(a). However, other provisions of the statute use the term "applicant" to refer to the individual or entity that seeks the loan from the financial institution. See, e.g., Article 83A, § 5-1030(b)(3), (5) (referring to loan documents "executed by the financial institution and the applicant" and to the inability of the applicant to obtain adequate financing through normal lending channels). To avoid confusion, this opinion generally uses the term "borrower" to denote the individual or entity required to meet the social or economic disadvantage criteria.
[4] The statute reads:
 (4) The applicant is unable to obtain adequate business financing on reasonable terms through normal lending channels because the applicant:
 (i) Belongs to a group that historically has been deprived of access to normal economic or financial resources because of race, color, creed, sex, religion, or national origin;
 (ii) Has an identifiable physical handicap that severely limits the ability of the applicant to obtain financial assistance, but does not limit the ability of the applicant to perform the contract or other activity for which the applicant would be receiving financial assistance; or
 (iii) Has any other social or economic impediment that is beyond the personal control of the applicant, such as lack of formal education or financial capacity or geographical or regional economic distress but that does not limit the ability of the applicant to perform the contract or other activity for which the applicant would be receiving financial assistance.
Article 83A, § 5-1025(b)(4).
[5] Because your question concerns interpretation of economic impediment under the third clause of § 5-1025(b)(4), we need not address the first two categories — individuals with a physical disability and individuals who belong to groups that historically have been denied access to normal financial or economic resources on the basis of race, sex, or certain other immutable characteristics. We note that use of some of these categories may be unconstitutional in the absence of a study documenting ongoing discrimination. See Adarand Constructors,Inc. v. Pena, 515 U.S. 200 (1995); City of Richmond v. J. A. Croson Co.,488 U.S. 469 (1989).
[6] According to the DBED response, "tangible net worth" is a concept used by the lending industry in the credit analysis of a potential borrower. "The distinction is that tangible net worth conservatively removes the value of the assets relating to the affiliated interests or entities whose own fortunes might affect the repayment of the obligation being considered." Audit Report, Appendix A (DBED Response), p. 8.
[7] The DBED Desktop Policy and Procedures Manual provides guidance to DBED staff on how to evaluate the credit worthiness of applicants.
[8] The SBA loan guarantee was not contingent on a showing that the applicant was socially or economically disadvantaged.
[9] In its original incarnation, the statute defined "eligible applicant" to include individuals or businesses largely owned by individuals who, among other criteria, were "socially or economically disadvantaged." Article 41, § 266HH-2(b) (1978). The latter phrase, in turn, was defined as follows:
. . . the social or economic disadvantage that derives from:
 (1) a socially or economically deprived individual who is a member of a group which has been historically deprived of access to normal economic or financial resources because of race, color, creed, sex, religion, or national origin;
 (2) an individual suffering from an identifiable physical handicap which severely limits the ability to obtain financial assistance to enter a business venture, provided the physical handicap does not limit the individual's ability to perform the contract;
 (3) a U.S. citizen whose participation in the free enterprise system is impeded due to other social or economic considerations beyond his personal control, such as formal education, financial capacity, geographical, or regional economic distress, provided the impediment does not limit the individual's ability to perform the contract.
Article 41, § 266HH-2(c). In 1980, when the MSBDFA statute was recodified as part of the Financial Institutions Article ("FI"), this provision was revised "without substantive change" as a summary of qualifications of applicants rather than as a definition, and was recodified as FI § 13-231(b)(4). See Revisor's Note to FI § 13-231, Chapter 33, Laws of Maryland 1980. In 1995, this section, along with the rest of the MSBDFA statute, was transferred to Article 83A and recodified in its current form as § 5-1025(b)(4), again without substantive revision. Chapter 120, Laws of Maryland 1995.
[10] At its inception in 1978, MSBDFA became a unit of DECD. In 1987, as part of a government reorganization, responsibilities relating to MSBDFA were transferred to a new Department of Economic and Employment Development. Chapter 311, Laws of Maryland 1987. Eight years later, as part of another government reorganization, that agency was renamed the Department of Business and Employment Development. Chapter 120, Laws of Maryland 1995.
[11] The Director of the Institute for Small Business at Frostburg State College elaborated in a letter to the Senate Economic Affairs Committee:
 There are many people in Western Maryland and on the Eastern Shore who are socially and economically disadvantaged but who are not members of a minority group. These people would seem to be excluded from assistance under the provisions of this Bill.
Letter of James F. DeCarlo, Jr., Director, to Senator Harry J. McGuirk (March 21, 1977).
[12] The only difference between the two bills relevant to this issue is that the amended 1977 bill would have explicitly designated veterans as socially and economically disadvantaged, while the 1978 bill made no reference to veterans.
[13] Pub.L. 85-536, § 2[8], 72 Stat. 389 (1958), codified at15 U.S.C. § 631 et seq.
[14] "Socially disadvantaged" individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as members of a group without regard to their individual qualities. 15 U.S.C. § 637(a)(5). According to the House Conference Report:
 In other words, because of present and past discrimination many minorities have suffered social disadvantagement.
 However, the conferees realize that other Americans may also suffer from social disadvantagement because of cultural bias. For example, a poor Appalachian white person who has never had the opportunity for a quality education or the ability to expand his or her cultural horizons, may similarly be found socially disadvantaged, provided that the conditions leading to such disadvantagement are beyond the ability of the person to control.
 With respect to the economic status of the applicant, the SBA shall develop standards, along major industry lines, which recognize the historic past discrimination of minorities in their efforts to participate in the free enterprise system. The standards must not deny admission to the 8(a) program to applicants merely because they managed to acquire a quality education. . . . The conferees intend that the assets and net worth of the applicant will be evaluated along with other factors, on the basis of the applicant's business as compared to others in the same field who are not suffering from social impediments.
House Conference Report 95-1714 (October 4, 1978), 1978 U.S. Code Cong. 
Admin. News 3879, 3882-83. The Supreme Court subsequently held that the use of race to assess eligibility for this program would be subject to strict scrutiny under the Equal Protection Clause of the Constitution.Adarand Contractors, Inc. v. Pena, 515 U.S. 200 (1995).
[15] The precise definition of "economically disadvantaged" in the SBA regulations presumably would not encompass all individuals eligible under the MSBDFA program because, consistent with the federal statute, the SBA regulations define an "economically disadvantaged" individual as someone who is also "socially disadvantaged." By contrast, an individual who iseither socially or economically disadvantaged is eligible for assistance under the MSBDFA statute. Nonetheless, the SBA regulations illustrate one agency's effort to establish criteria for measuring economic disadvantage.
[16] See Kahlenberg, Class-Based Affirmative Action, 84 Calif. L.Rev. 1037, 1065 (1996). One commentator has suggested that a government agency required to assess social and economic disadvantage could find objective measures in the individual's income and wealth, the education and occupations of the individual's parents, the individual's own schooling opportunities, geographic origin, and family structure. Id.
at 1072-85.
[17] Such a designation presumably would encompass areas in all regions of the State, consistent with Article 83A, § 5-1028(b) (". . . the Authority shall recognize the need to serve applicants from all political subdivisions of the State.").
[18] We understand from DBED's response to the Audit Report that there is no dispute that the "financial capacity" referenced in the statute is that of the individual(s) who own the business, not the business itself, as it is the owners who must be disadvantaged for the business to qualify for assistance. (Otherwise, a business could lack "financial capacity" simply because an owner chose to undercapitalize it.) On the other hand, in determining whether an owner lacks financial capacity, the Authority can take into account the type of business venture. The yardstick against which an owner's financial capacity is assessed may vary according to the nature of the business.
[19] With respect to loan guarantees, the MSBDFA statute sets a cap of $500,000 for a guarantee related to a particular contract and a cap of $600,000 for a guarantee of a long-term loan unrelated to a particular contract. Article 83A, §§ 5-1022(a)(3), 5-1029(a)(2). There is also a cap of $500,000 for an outright loan related to a specific contract. Article 83A, § 5-1024(a)(2).
[20] It may be difficult to write a regulation that distinguishes from a multitude of economic impediments those that are deserving of assistance — i.e., beyond the control of the individual — from those that are not. However, the Authority can require the applicant to articulate the nature of the impediment, state why it is beyond the control of the applicant, and explain how it renders the applicant "disadvantaged" in comparison to other entrepreneurs in the same type of business.
 *Page 306